## BARKER *v.* WINGO, WARDEN

No. 71–5255.   Argued April 11, 1972—Decided June 22, 1972

POWELL, J., delivered the opinion for a unanimous Court.   WHITE, J., filed a concurring opinion, in which BRENNAN, J., joined, *post,* p. 536.

*James E. Milliman* argued the cause for petitioner *pro hac vice.*   With him on the brief were *Norvie L. Lay* and *J. Chester Porter.*

*Robert W. Willmott, Jr.,* Assistant Attorney General of Kentucky, argued the cause for respondent *pro hac vice.* With him on the brief was *Ed W. Hancock,* Attorney General.

Briefs of *amici curiae* were filed by *Solicitor General Griswold* for the United States, and by *Thomas D. Barr* for the Lawyers Committee for Civil Rights Under Law.

MR. JUSTICE POWELL delivered the opinion of the Court.

Although a speedy trial is guaranteed the accused by the Sixth Amendment to the Constitution,[1] this Court has dealt with that right on infrequent occasions. See *Beavers* v. *Haubert,* 198 U. S. 77 (1905); *Pollard* v. *United States,* 352 U. S. 354 (1957); *United States* v. *Ewell,* 383 U. S. 116 (1966); *United States* v. *Marion,* 404 U. S. 307 (1971). See also *United States* v. *Provoo,* 17 F. R. D. 183 (D. Md.), aff'd, 350 U. S. 857 (1955). The Court's opinion in *Klopfer* v. *North Carolina,* 386 U. S. 213 (1967), established that the right to a speedy trial is "fundamental" and is imposed by the Due Process Clause of the Fourteenth Amendment on the States.[2] See *Smith* v. *Hooey,* 393 U. S. 374 (1969); *Dickey* v. *Florida,* 398 U. S. 30 (1970). As MR. JUSTICE BRENNAN

---

[1] The Sixth Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

[2] "We hold here that the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment." 386 U. S., at 223.

pointed out in his concurring opinion in *Dickey,* in none of these cases have we attempted to set out the criteria by which the speedy trial right is to be judged. 398 U. S., at 40–41. This case compels us to make such an attempt.

I

On July 20, 1958, in Christian County, Kentucky, an elderly couple was beaten to death by intruders wielding an iron tire tool. Two suspects, Silas Manning and Willie Barker, the petitioner, were arrested shortly thereafter. The grand jury indicted them on September 15. Counsel was appointed on September 17, and Barker's trial was set for October 21. The Commonwealth had a stronger case against Manning, and it believed that Barker could not be convicted unless Manning testified against him. Manning was naturally unwilling to incriminate himself. Accordingly, on October 23, the day Silas Manning was brought to trial, the Commonwealth sought and obtained the first of what was to be a series of 16 continuances of Barker's trial.[3] Barker made no objection. By first convicting Manning, the Commonwealth would remove possible problems of self-incrimination and would be able to assure his testimony against Barker.

The Commonwealth encountered more than a few difficulties in its prosecution of Manning. The first trial ended in a hung jury. A second trial resulted in a conviction, but the Kentucky Court of Appeals reversed because of the admission of evidence obtained by an illegal search. *Manning* v. *Commonwealth,* 328 S. W. 2d 421 (1959). At his third trial, Manning was again convicted, and the Court of Appeals again reversed

---

[3] There is no explanation in the record why, although Barker's initial trial was set for October 21, no continuance was sought until October 23, two days after the trial should have begun.

because the trial court had not granted a change of venue. *Manning* v. *Commonwealth*, 346 S. W. 2d 755 (1961). A fourth trial resulted in a hung jury. Finally, after five trials, Manning was convicted, in March 1962, of murdering one victim, and after a sixth trial, in December 1962, he was convicted of murdering the other.[4]

The Christian County Circuit Court holds three terms each year—in February, June, and September. Barker's initial trial was to take place in the September term of 1958. The first continuance postponed it until the February 1959 term. The second continuance was granted for one month only. Every term thereafter for as long as the Manning prosecutions were in process, the Commonwealth routinely moved to continue Barker's case to the next term. When the case was continued from the June 1959 term until the following September, Barker, having spent 10 months in jail, obtained his release by posting a $5,000 bond. He thereafter remained free in the community until his trial. Barker made no objection, through his counsel, to the first 11 continuances.

When on February 12, 1962, the Commonwealth moved for the twelfth time to continue the case until the following term, Barker's counsel filed a motion to dismiss the indictment. The motion to dismiss was denied two weeks later, and the Commonwealth's motion for a continuance was granted. The Commonwealth was granted further continuances in June 1962 and September 1962, to which Barker did not object.

In February 1963, the first term of court following Manning's final conviction, the Commonwealth moved to set Barker's trial for March 19. But on the day scheduled for trial, it again moved for a continuance until the June term. It gave as its reason the illness

---

[4] Apparently Manning chose not to appeal these final two convictions.

of the ex-sheriff who was the chief investigating officer in the case. To this continuance, Barker objected unsuccessfully.

The witness was still unable to testify in June, and the trial, which had been set for June 19, was continued again until the September term over Barker's objection. This time the court announced that the case would be dismissed for lack of prosecution if it were not tried during the next term. The final trial date was set for October 9, 1963. On that date, Barker again moved to dismiss the indictment, and this time specified that his right to a speedy trial had been violated.[5] The motion was denied; the trial commenced with Manning as the chief prosecution witness; Barker was convicted and given a life sentence.

Barker appealed his conviction to the Kentucky Court of Appeals, relying in part on his speedy trial claim. The court affirmed. *Barker* v. *Commonwealth*, 385 S. W. 2d 671 (1964). In February 1970 Barker petitioned for habeas corpus in the United States District Court for the Western District of Kentucky. Although the District Court rejected the petition without holding a hearing, the court granted petitioner leave to appeal *in forma pauperis* and a certificate of probable cause to appeal. On appeal, the Court of Appeals for the Sixth Circuit affirmed the District Court. 442 F. 2d 1141 (1971). It ruled that Barker had waived his speedy trial claim for the entire period before February 1963, the date on which the court believed he had first objected to the delay by filing a motion to dismiss. In this belief the court was mistaken, for the record re-

[5] The written motion Barker filed alleged that he had objected to every continuance since February 1959. The record does not reflect any objections until the motion to dismiss, filed in February 1962, and the objections to the continuances sought by the Commonwealth in March 1963 and June 1963.

veals that the motion was filed in February 1962. The Commonwealth so conceded at oral argument before this Court.[6] The court held further that the remaining period after the date on which Barker first raised his claim and before his trial—which it thought was only eight months but which was actually 20 months—was not unduly long. In addition, the court held that Barker had shown no resulting prejudice, and that the illness of the ex-sheriff was a valid justification for the delay. We granted Barker's petition for certiorari. 404 U. S. 1037 (1972).

## II

The right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused. In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused. The inability of courts to provide a prompt trial has contributed to a large backlog of cases in urban courts which, among other things, enables defendants to negotiate more effectively for pleas of guilty to lesser offenses and otherwise manipulate the system.[7] In addition, persons released on bond for lengthy periods awaiting trial have an opportunity to commit other crimes.[8] It must be of little comfort to the residents of Christian County, Kentucky, to know that Barker was at large on bail for over four years while accused of a vicious

---

[6] Tr. of Oral Arg. 33.

[7] Report of the President's Commission on Crime in the District of Columbia 256 (1966).

[8] In Washington, D. C., in 1968, 70.1% of the persons arrested for robbery and released prior to trial were re-arrested while on bail. Mitchell, Bail Reform and the Constitutionality of Pretrial Deten-

and brutal murder of which he was ultimately convicted. Moreover, the longer an accused is free awaiting trial, the more tempting becomes his opportunity to jump bail and escape.[9] Finally, delay between arrest and punishment may have a detrimental effect on rehabilitation.[10]

If an accused cannot make bail, he is generally confined, as was Barker for 10 months, in a local jail. This contributes to the overcrowding and generally deplorable state of those institutions.[11] Lengthy exposure to these conditions "has a destructive effect on human character and makes the rehabilitation of the individual offender much more difficult."[12] At times the result may even be violent rioting.[13] Finally, lengthy pretrial detention is costly. The cost of maintaining a prisoner in jail varies from $3 to $9 per day, and this amounts to millions across

tion, 55 Va. L. Rev. 1223, 1236 (1969), citing Report of the Judicial Council Committee to Study the Operation of the Bail Reform Act in the District of Columbia 20–21 (1969).

[9] The number of these offenses has been increasing. See Annual Report of the Director of the Administrative Office of the United States Courts, 1971, p. 321.

[10] "[I]t is desirable that punishment should follow offence as closely as possible; for its impression upon the minds of men is weakened by distance, and, besides, distance adds to the uncertainty of punishment, by affording new chances of escape." J. Bentham, The Theory of Legislation 326 (Ogden ed. 1931).

[11] To Establish Justice, To Insure Domestic Tranquility, Final Report of the National Commission on the Causes and Prevention of Violence 152 (1969).

[12] Testimony of James V. Bennett, Director, Bureau of Prisons, Hearings on Federal Bail Procedures before the Subcommittee on Constitutional Rights and the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 88th Cong., 2d Sess., 46 (1964).

[13] *E. g.,* the "Tombs" riots in New York City in 1970. N. Y. Times, Oct. 3, 1970, p. 1; col. 8.

the Nation.[14] In addition, society loses wages which might have been earned, and it must often support families of incarcerated breadwinners.

A second difference between the right to speedy trial and the accused's other constitutional rights is that deprivation of the right may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend himself.

Finally, and perhaps most importantly, the right to speedy trial is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied. We cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate.[15] As a consequence, there is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial. If, for example, the State moves for

---

[14] The Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice 131 (1967).

[15] "[I]n large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." *United States* v. *Ewell*, 383 U. S. 116, 120 (1966).

a 60-day continuance, granting that continuance is not a violation of the right to speedy trial unless the circumstances of the case are such that further delay would endanger the values the right protects. It is impossible to do more than generalize about when those circumstances exist. There is nothing comparable to the point in the process when a defendant exercises or waives his right to counsel or his right to a jury trial. Thus, as we recognized in *Beavers* v. *Haubert, supra,* any inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case:

> "The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." 198 U. S., at 87.

The amorphous quality of the right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial,[16] but it is the only possible remedy.

### III

Perhaps because the speedy trial right is so slippery, two rigid approaches are urged upon us as ways of eliminating some of the uncertainty which courts ex-

---

[16] MR. JUSTICE WHITE noted in his opinion for the Court in *Ewell, supra,* at 121, that overzealous application of this remedy would infringe "the societal interest in trying people accused of crime, rather than granting them immunization because of legal error. . . ."

perience in protecting the right. The first suggestion is that we hold that the Constitution requires a criminal defendant to be offered a trial within a specified time period. The result of such a ruling would have the virtue of clarifying when the right is infringed and of simplifying courts' application of it. Recognizing this, some legislatures have enacted laws, and some courts have adopted procedural rules which more narrowly define the right.[17] The United States Court of Appeals for the Second Circuit has promulgated rules for the district courts in that Circuit establishing that the government must be ready for trial within six month's of the date of arrest, except in unusual circumstances, or the charge will be dismissed.[18] This type of rule is also recommended by the American Bar Association.[19]

But such a result would require this Court to engage in legislative or rulemaking activity, rather than in the adjudicative process to which we should confine our efforts. We do not establish procedural rules for the States, except when mandated by the Constitution. We find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months. The States, of course, are free to prescribe a reasonable period consistent with constitutional standards, but our approach must be less precise.

The second suggested alternative would restrict con-

---

[17] For examples, see American Bar Association Project on Standards for Criminal Justice, Speedy Trial 14–16 (Approved Draft 1968); Note, The Right to a Speedy Criminal Trial, 57 Col. L. Rev. 846, 863 (1957).

[18] Second Circuit Rules Regarding Prompt Disposition of Criminal Cases (1971).

[19] ABA Project, *supra*, n. 17, at 14. For an example of a proposed statutory rule, see Note, The Lagging Right to a Speedy Trial, 51 Va. L. Rev. 1587, 1619 (1965).

sideration of the right to those cases in which the accused has demanded a speedy trial. Most States have recognized what is loosely referred to as the "demand rule," [20] although eight States reject it.[21] It is not clear, however, precisely what is meant by that term. Although every federal court of appeals that has considered the question has endorsed some kind of demand rule, some have regarded the rule within the concept of waiver,[22] whereas others have viewed it as a factor to be weighed

---

[20] *E. g., Pines* v. *District Court of Woodbury County,* 233 Iowa 1284, 10 N. W. 2d 574 (1943). See generally Note, The Right to a Speedy Criminal Trial, 57 Col. L. Rev. 846, 853 (1957); Note, The Lagging Right to a Speedy Trial, 51 Va. L. Rev. 1587, 1601–1602 (1965).

[21] See *State* v. *Maldonado,* 92 Ariz. 70, 373 P. 2d 583 *(en banc),* cert. denied, 371 U. S. 928 (1962); *Hicks* v. *People,* 148 Colo. 26, 364 P. 2d 877 (1961) *(en banc); People* v. *Prosser,* 309 N. Y. 353, 130 N. E. 2d 891 (1955); *Zehrlaut* v. *State,* 230 Ind. 175, 102 N. E. 2d 203 (1951); *Flanary* v. *Commonwealth,* 184 Va. 204, 35 S. E. 2d 135 (1945); *Ex parte Chalfant,* 81 W. Va. 93, 93 S. E. 1032 (1917); *State* v. *Hess,* 180 Kan. 472, 304 P. 2d 474 (1956); *State* v. *Dodson,* 226 Ore. 458, 360 P. 2d 782 (1961). But see *State* v. *Vawter,* 236 Ore. 85, 386 P. 2d 915 (1963).

[22] See *United States* v. *Hill,* 310 F. 2d 601 (CA4 1962); *Bruce* v. *United States,* 351 F. 2d 318 (CA5 1965), cert. denied, 384 U. S. 921 (1966); *United States* v. *Perez,* 398 F. 2d 658 (CA7 1968), cert. denied, 393 U. S. 1080 (1969); *Pietch* v. *United States,* 110 F. 2d-817 (CA10), cert. denied, 310 U. S. 648 (1940); *Smith* v. *United States,* 118 U. S. App. D. C. 38, 331 F. 2d 784 (1964) *(en banc).* The opinion below in this case demonstrates that the Sixth Circuit takes a similar approach.

As an indication of the importance which these courts have attached to the demand rule, see *Perez, supra,* in which the court held that a defendant waived any speedy trial claim, because he knew of an indictment and made no demand for an immediate trial, even though the record gave no indication that he was represented by counsel at the time when he should have made his demand, and even though he was not informed by the court or the prosecution of his right to a speedy trial.

in assessing whether there has been a deprivation of the speedy trial right.[23] We shall refer to the former approach as the demand-waiver doctrine. The demand-waiver doctrine provides that a defendant waives any consideration of his right to speedy trial for any period prior to which he has not demanded a trial. Under this rigid approach, a prior demand is a necessary condition to the consideration of the speedy trial right. This essentially was the approach the Sixth Circuit took below.

Such an approach, by presuming waiver of a fundamental right [24] from inaction, is inconsistent with this Court's pronouncements on waiver of constitutional rights. The Court has defined waiver as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938). Courts should "indulge every reasonable presumption against waiver," *Aetna Ins. Co.* v. *Kennedy,* 301 U. S. 389, 393 (1937), and they should "not presume acqui-

---

[23] Although stating that they recognize a demand rule, the approach of the Eighth and Ninth Circuits seems to be that a denial of speedy trial can be found despite an absence of a demand under some circumstances. See *Bandy* v. *United States,* 408 F. 2d 518 (CA8 1969) (a purposeful or oppressive delay may overcome a failure to demand); *Moser* v. *United States,* 381 F. 2d 363 (CA9 1967) (despite a failure to demand, the court balanced other considerations).

The Second Circuit's approach is unclear. There are cases in which a failure to demand is strictly construed as a waiver. *E. g., United States* v. *DeMasi,* 445 F. 2d 251 (1971). In other cases, the court has seemed to be willing to consider claims in which there was no demand. *E. g., United States ex rel. Solomon* v. *Mancusi,* 412 F. 2d 88, cert. denied, 396 U. S. 936 (1969). Certainly the District Courts in the Second Circuit have not regarded the demand rule as being rigid. See *United States* v. *Mann,* 291 F. Supp. 268 (SDNY 1968); *United States* v. *Dillon,* 183 F. Supp. 541 (SDNY 1960).

The First Circuit also seems to reject the more rigid approach. Compare *United States* v. *Butler,* 426 F. 2d 1275 (1970), with *Needel* v. *Scafati,* 412 F. 2d 761, cert. denied, 396 U. S. 861 (1969).

[24] See n. 2, *supra.*

escence in the loss of fundamental rights," *Ohio Bell Tel. Co.* v. *Public Utilities Comm'n,* 301 U. S. 292, 307 (1937). In *Carnley* v. *Cochran,* 369 U. S. 506 (1962), we held:

> "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less is not waiver." *Id.,* at 516.

The Court has ruled similarly with respect to waiver of other rights designed to protect the accused. See, *e. g., Miranda* v. *Arizona,* 384 U. S. 436, 475–476 (1966); *Boykin* v. *Alabama,* 395 U. S. 238 (1969).

In excepting the right to speedy trial from the rule of waiver we have applied to other fundamental rights, courts that have applied the demand-waiver rule have relied on the assumption that delay usually works for the benefit of the accused and on the absence of any readily ascertainable time in the criminal process for a defendant to be given the choice of exercising or waiving his right. But it is not necessarily true that delay benefits the defendant. There are cases in which delay appreciably harms the defendant's ability to defend himself.[25]

---

[25] "If a defendant deliberately by-passes state procedure for some strategic, tactical, or other reason, a federal judge on habeas corpus may deny relief if he finds that the by-passing was the *considered* choice of the petitioner. The demand doctrine presupposes that failure to demand trial is a deliberate choice for supposed advantage on the assumption that delay always benefits the accused, but the delay does not inherently benefit the accused any more than it does the state. Consequently, a man should not be presumed to have exercised a deliberate choice because of silence or inaction that could equally mean that he is unaware of the necessity for a demand." Note, The Lagging Right to a Speedy Trial, 51 Va. L. Rev. 1587, 1610 (1965) (footnotes omitted).

Moreover, a defendant confined to jail prior to trial is obviously disadvantaged by delay as is a defendant released on bail but unable to lead a normal life because of community suspicion and his own anxiety.

The nature of the speedy trial right does make it impossible to pinpoint a precise time in the process when the right must be asserted or waived, but that fact does not argue for placing the burden of protecting the right solely on defendants. A defendant has no duty to bring himself to trial; [26] the State has that duty as well as the duty of insuring that the trial is consistent with due process.[27] Moreover, for the reasons earlier expressed, society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest.

It is also noteworthy that such a rigid view of the demand-waiver rule places defense counsel in an awkward position. Unless he demands a trial early and often, he is in danger of frustrating his client's right. If counsel is willing to tolerate some delay because he finds it reasonable and helpful in preparing his own case, he may be unable to obtain a speedy trial for his client at the end of that time. Since under the demand-waiver rule no time

---

[26] As MR. CHIEF JUSTICE BURGER wrote for the Court in *Dickey* v. *Florida:*

"Although a great many accused persons seek to put off the confrontation as long as possible, the right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial." 398 U. S. 30, 37–38 (1970) (footnote omitted).

[27] As a circuit judge, MR. JUSTICE BLACKMUN wrote:

"The government and, for that matter, the trial court are not without responsibility for the expeditious trial of criminal cases. The burden for trial promptness is not solely upon the defense. The right to 'a speedy . . . trial' is constitutionally guaranteed and, as such, is not to be honored only for the vigilant and the knowledgeable." *Hodges* v. *United States*, 408 F. 2d 543, 551 (CA8 1969).

runs until the demand is made, the government will have whatever time is otherwise reasonable to bring the defendant to trial after a demand has been made. Thus, if the first demand is made three months after arrest in a jurisdiction which prescribes a six-month rule, the prosecution will have a total of nine months—which may be wholly unreasonable under the circumstances. The result in practice is likely to be either an automatic, *pro forma* demand made immediately after appointment of counsel or delays which, but for the demand-waiver rule, would not be tolerated. Such a result is not consistent with the interests of defendants, society, or the Constitution.

We reject, therefore, the rule that a defendant who fails to demand a speedy trial forever waives his right.[28] This does not mean, however, that the defendant has no responsibility to assert his right. We think the better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right. Such a formulation avoids the rigidities of the demand-waiver rule and the resulting possible unfairness in its application. It allows the trial court

---

[28] The American Bar Association also rejects the rigid demand-waiver rule:

"One reason for this position is that there are a number of situations, such as where the defendant is unaware of the charge or where the defendant is without counsel, in which it is unfair to require a demand . . . . Jurisdictions with a demand requirement are faced with the continuing problem of defining exceptions, a process which has not always been carried out with uniformity . . . . More important, the demand requirement is inconsistent with the public interest in prompt disposition of criminal cases. . . . [T]he trial of a criminal case should not be unreasonably delayed merely because the defendant does not think that it is in his best interest to seek prompt disposition of the charge." ABA Project, *supra*, n. 17, at 17.

to exercise a judicial discretion based on the circumstances, including due consideration of any applicable formal procedural rule. It would permit, for example, a court to attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client, or from a situation in which no counsel is appointed. It would also allow a court to weigh the frequency and force of the objections as opposed to attaching significant weight to a purely *pro forma* objection.

In ruling that a defendant has some responsibility to assert a speedy trial claim, we do not depart from our holdings in other cases concerning the waiver of fundamental rights, in which we have placed the entire responsibility on the prosecution to show that the claimed waiver was knowingly and voluntarily made. Such cases have involved rights which must be exercised or waived at a specific time or under clearly identifiable circumstances, such as the rights to plead not guilty, to demand a jury trial, to exercise the privilege against self-incrimination, and to have the assistance of counsel. We have shown above that the right to a speedy trial is unique in its uncertainty as to when and under what circumstances it must be asserted or may be deemed waived. But the rule we announce today, which comports with constitutional principles, places the primary burden on the courts and the prosecutors to assure that cases are brought to trial. We hardly need add that if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine, the demand rule aside.

We, therefore, reject both of the inflexible approaches—the fixed-time period because it goes further than the Constitution requires; the demand-waiver rule because it is insensitive to a right which we have deemed

fundamental. The approach we accept is ·a balancing test, in which the conduct of both the prosecution and the defendant are weighed.[29]

## IV

A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether. a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.[30]

The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to ·speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the pecu-

[29] Nothing we have said should be interpreted as disapproving a presumptive rule adopted by a court in the exercise of its supervisory powers which establishes a fixed time period within which cases must normally be brought. See n. 18, *supra*.

[30] See, *e. g., United States* v. *Simmons*, 338 F. 2d 804, 807· (CA2 1964), cert. denied, 380 U. S. 983 (1965); Note, The Right to a Speedy Trial, 20 Stan. L. Rev. 476, 478 n. 15 (1968).

In his concurring opinion in *Dickey*, Mr. Justice Brennan identified three factors for consideration: the source of the delay, the reasons for it, and whether the delay prejudiced the interests protected by the right. 398 U. S., at 48. He included consideration of the defendant's failure to assert his right in the cause-of-delay category, and he thought the length of delay was relevant ·primarily to the reasons for delay and its prejudicial effects. *Id.,* n. 12. In essence, however, there is little difference between his approach and the one we adopt today. See also Note, The Right to a Speedy Trial, *supra,* for another slightly different approach.

liar circumstances of the case.[31] To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.

Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.[32] A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

We have already discussed the third factor, the defendant's responsibility to assert his right. Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in de-

---

[31] For example, the First Circuit thought a delay of nine months overly long, absent a good reason, in a case that depended on eyewitness testimony. *United States* v. *Butler*, 426 F. 2d 1275, 1277 (1970).

[32] We have indicated on previous occasions that it is improper for the prosecution intentionally to delay "to gain some tactical advantage over [defendants] or to harass them." *United States* v. *Marion*, 404 U. S. 307, 325 (1971). See *Pollard* v. *United States*, 352 U. S. 354, 361 (1957).

termining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.[33] Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

We have discussed previously the societal disadvantages of lengthy pretrial incarceration, but obviously the disadvantages for the accused who cannot obtain his release are even more serious. The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs.[34] The time spent in

[33] *United States* v. *Ewell*, 383 U. S., at 120; *Smith* v. *Hooey*, 393 U. S. 374, 377–378 (1969). In *Klopfer* v. *North Carolina*, 386 U. S. 213, 221–222 (1967), we indicated that a defendant awaiting trial on bond might be subjected to public scorn, deprived of employment, and chilled in the exercise of his right to speak for, associate with, and participate in unpopular political causes.

[34] See To Establish Justice, To Insure Domestic Tranquility, Final Report of the National Commission on the Causes and Prevention of Violence 152 (1969).

jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense.[35] Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent. Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility. See cases cited in n. 33, *supra.*

We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.[36] But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

## V

The difficulty of the task of balancing these factors is illustrated by this case, which we consider to be close. It is clear that the length of delay between arrest and trial—well over five years—was extraordinary. Only

---

[35] There is statistical evidence that persons who are detained between arrest and trial are more likely to receive prison sentences than those who obtain pretrial release, although other factors bear upon this correlation. See Wald, Pretrial Detention and Ultimate Freedom: A Statistical Study, 39 N. Y. U. L. Rev. 631 (1964).

[36] For an example of how the speedy trial issue should be approached, see Judge Frankel's excellent opinion in *United States* v. *Mann,* 291 F. Supp. 268 (SDNY 1968).

seven months of that period can be attributed to a strong excuse, the illness of the ex-sheriff who was in charge of the investigation. Perhaps some delay would have been permissible under ordinary circumstances, so that Manning could be utilized as a witness in Barker's trial, but more than four years was too long a period, particularly since a good part of that period was attributable to the Commonwealth's failure or inability to try Manning under circumstances that comported with due process.

Two counterbalancing factors, however, outweigh these deficiencies. The first is that prejudice was minimal. Of course, Barker was prejudiced to some extent by living for over four years under a cloud of suspicion and anxiety. Moreover, although he was released on bond for most of the period, he did spend 10 months in jail before trial. But there is no claim that any of Barker's witnesses died or otherwise became unavailable owing to the delay. The trial transcript indicates only two very minor lapses of memory—one on the part of a prosecution witness—which were in no way significant to the outcome.

More important than the absence of serious prejudice, is the fact that Barker did not want a speedy trial. Counsel was appointed for Barker immediately after his indictment and represented him throughout the period. No question is raised as to the competency of such counsel.[37] Despite the fact that counsel had notice of the motions for continuances,[38] the record shows no action whatever taken between October 21, 1958, and February 12, 1962, that could be construed as the assertion of the speedy trial right. On the latter date, in response to another motion for continuance, Barker moved

---

[37] Tr. of Oral Arg. 39.

[38] *Id.,* at 4.

to dismiss the indictment. The record does not show on what ground this motion was based, although it is clear that no alternative motion was made for an immediate trial. Instead the record strongly suggests that while he hoped to take advantage of the delay in which he had acquiesced and thereby obtain a dismissal of the charges, he definitely did not want to be tried. Counsel conceded as much at oral argument:

> "Your honor, I would concede that Willie Mae Barker probably—I don't know this for a fact— probably did not want to be tried. I don't think any man wants to be tried. And I don't consider this a liability on his behalf. I don't blame him." Tr. of Oral Arg. 39.

The probable reason for Barker's attitude was that he was gambling on Manning's acquittal. The evidence was not very strong against Manning, as the reversals and hung juries suggest, and Barker undoubtedly thought that if Manning were acquitted, he would never be tried. Counsel also conceded this:

> "Now, it's true that the reason for this delay was the Commonwealth of Kentucky's desire to secure the testimony of the accomplice, Silas Manning. And it's true that if Silas Manning were never convicted, Willie Mae Barker would never have been convicted. We concede this." *Id.*, at 15.[39]

---

[39] Hindsight is, of course, 20/20, but we cannot help noting that if Barker had moved immediately and persistently for a speedy trial following indictment, and if he had been successful, he would have undoubtedly been acquitted since Manning's testimony was crucial to the Commonwealth's case. It could not have been anticipated at the outset, however, that Manning would have been tried six times over a four-year period. Thus, the decision to gamble on Manning's acquittal may have been a prudent choice at the time it was made.

That Barker was gambling on Manning's acquittal is also suggested by his failure, following the *pro forma* motion to dismiss filed in February 1962, to object to the Commonwealth's next two motions for continuances. Indeed, it was not until March 1963, after Manning's convictions were final, that Barker, having lost his gamble, began to object to further continuances. At that time, the Commonwealth's excuse was the illness of the ex-sheriff, which Barker has conceded justified the further delay.[40]

We do not hold that there may never be a situation in which an indictment may be dismissed on speedy trial grounds where the defendant has failed to object to continuances. There may be a situation in which the defendant was represented by incompetent counsel, was severely prejudiced, or even cases in which the continuances were granted *ex parte*. But barring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial. We hold, therefore, that Barker was not deprived of his due process right to a speedy trial.

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN joins, concurring.

Although the Court rejects petitioner's speedy trial claim and affirms denial of his petition for habeas corpus,

---

[40] At oral argument, counsel for Barker stated:

"That was after the sheriff, the material witness, was ill; the man who had arrested the petitioner, yes. And the Sixth Circuit held that this was a sufficient reason for delay, and we don't deny this. We concede that this was sufficient for the delay from March 1963 to October, but it does not explain the delays prior to that." Tr. of Oral Arg. 19–20.

it is apparent that had Barker not so clearly acquiesced in the major delays involved in this case, the result would have been otherwise. From the Commonwealth's point of view, it is fortunate that the case was set for early trial and that postponements took place only upon formal requests to which Barker had opportunity to object.

Because the Court broadly assays the factors going into constitutional judgments under the speedy trial provision, it is appropriate to emphasize that one of the major purposes of the provision is to guard against inordinate delay between public charge and trial, which, wholly aside from possible prejudice to a defense on the merits, may "seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *United States v. Marion*, 404 U. S. 307, 320 (1971). These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty. It is also true that many defendants will believe that time is on their side and will prefer to suffer whatever disadvantages delay may entail. But, for those who desire an early trial, these personal factors should prevail if the only countervailing considerations offered by the State are those connected with crowded dockets and prosecutorial case loads. A defendant desiring a speedy trial, therefore, should have it within some reasonable time; and only special circumstances presenting a more pressing public need with respect to the case itself should suffice to justify delay. Only if such special considerations are in the case and if they outweigh the inevitable personal prejudice resulting from delay would

it be necessary to consider whether there has been or would be prejudice to the defense at trial. "[T]he major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense." *United States* v. *Marion, supra,* at 320.

Of course, cases will differ among themselves as to the allowable time between charge and trial so as to permit prosecution and defense adequately to prepare their case. But unreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal-justice system are limited and that each case must await its turn. As the Court points out, this approach also subverts the State's own goals in seeking to enforce its criminal laws.