**STATE**

v.

**Nicholas J. DeVITO.**

No. 78–339–C.A.

Supreme Court of Rhode Island.

April 23, 1980.

Dennis J. Roberts II, Atty. Gen., David H. Leach, Sp. Asst. Atty. Gen., for plaintiff.

Paul J. DiMaio, Providence, for defendant.

**OPINION**

KELLEHER, Justice.

A Superior Court jury returned a guilty verdict against the defendant, Nicholas J. DeVito (Nicholas), after hearing evidence on a criminal information charging him with assault with a dangerous weapon, to wit, an automobile. Nicholas's twofold appeal claims that the trial justice erred in rejecting his contention that his constitutional right to a speedy trial had been violated and in refusing to suppress an in-court identification of him as the driver of the dangerous weapon.

The prosecution's star witness, Patrolman Robert O. Coogan (Coogan), was walking a beat in downtown Providence at 1 a. m. on December 1, 1975. Coogan told the jury that at the time in question he had just turned the southeasterly corner at the intersection of Washington and Empire Streets and was proceeding along the southerly sidewalk of Washington Street in an easterly direction when he heard the screech of tires. When Coogan turned around, he saw a black Cadillac pulled up alongside the southerly curbline. This unexpected event piqued Coogan's interest because Washington Street is a one-way street restricted to westward-bound traffic.

Matters became more interesting when the Cadillac's occupants, Jose N. Cardillo, Jr., and Edward W. Perry (Perry), rushed up to Coogan to complain about a gun-wielding motorist in a maroon-colored car who had chased them through the downtown area as far west as Dean Street. The conversation came to an abrupt halt when the complainants informed Coogan that the maroon-colored automobile was now on Washington Street approaching them from the east. When Coogan spotted the car, he ran out into the street toward the approaching vehicle, raised his hand, and shouted, "Stop!" The moving vehicle veered towards Coogan, who immediately sought the sanctuary of the adjacent sidewalk. As the car flashed by, Coogan caught a glimpse of its two occupants as well as the number of the rear license plate. He used his walkie-talkie to inform headquarters of what had

just occurred, the direction the car was heading, and the number listed on the license plate. Within a matter of minutes, the speeding vehicle crashed against a utility pole on Knight Street. Nicholas was arrested as he was about to extricate himself from the driver's seat, while the car's owner and Nicholas's cousin, Rudolph DeVito (Rudolph), was found wandering three blocks away on Westminster Street. Coogan was taken to the collision scene where he identified the vehicle as the automobile that he had attempted to stop on Washington Street.

We reject Nicholas's claim that his constitutional guarantee to a speedy trial has been denied him. We, like the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 536, 92 S.Ct. 2182, 2195, 33 L.Ed.2d 101, 120 (1972), are not about to

"rule that * * * defendant was denied * * * [his] constitutional right [to speedy trial] on a record that strongly indicates, as does this one, that * * * [he] did not want a speedy trial."

There was an almost twenty-nine-month lapse between Nicholas's arrest and his April 1978 trial. Nicholas did not seek a dismissal of the information on the basis of a denial of a speedy trial until moments before the trial was to begin.

Part of the information packet given to the defense in August of 1976 included a statement by Perry, in which he described the gun-wielding driver as having "curly hair." [1] Nicholas and Rudolph differ in at least one physical attribute: Nicholas might be described as having a receding hairline, whereas his cousin Rudolph has a full head of hair. When the state sought discovery, the defense in its October 1976 reply listed Perry as one of its witnesses but made absolutely no attempt to contact him until March or April of 1978.

The only effort made to contact Perry occurred when a private detective went to the home of Perry's parents and interviewed his father. The information packet had listed Perry's address as his parents' home. The father told the detective that although Perry had not lived at home for the past two years, he did see his son on an off-and-on basis. Pursuant to the father's suggestion that he check the city's hotels, the detective investigated the YMCA, the Gemini Hotel, the Abbott Park, and the Civic View Inn.

The trial justice, in rejecting Nicholas's speedy-trial claim, described Nicholas's efforts in this area as "halfhearted." He also referred to the attempts to locate Perry as lacking "any great exertion or any great amount of diligence." The docket also discloses that on February 3, 1977, the defense received the so-called twenty-one-day notice, which signifies that the case could be reached any time thereafter. The trial justice commented adversely on the complete lack of effort to secure any kind of statement from Perry and the absence of any attempt to dispose of the case during the summer of 1977. It is obvious from his remarks that the trial justice believed that a speedy trial was the thought furthermost from Nicholas's mind. The filing of the motion was merely a perfunctory gesture since Nicholas preferred to bank on the lapse of time, hoping that witnesses would disappear or memories would become dim. On the record presented here, we see no reason to fault this conclusion.

An additional oral motion which also immediately preceded the beginning of the trial sought suppression of Coogan's in-court identification. At the hearing on this motion, Coogan testified that his in-court identification was based upon his observation of the automobile which sped by him on Washington Street. In his description of the driver, Coogan testified that "[h]is hair seemed to be a little bit bald." The defense sought to suppress the in-court identification by claiming that this description was a complete surprise. The state had furnished the defense with a copy of a report made by Coogan shortly after he returned to the

---

1. *Perry's contribution to the defense is extremely speculative. Immediately after the arrest, Nicholas and Rudolph were placed in a* lineup. Neither Perry nor his companion could identify either DeVito as being the driver-gunman.

police station following the arrest of Nicholas and his cousin. The defense argues that the state violated its duty of disclosure because the report contained no reference to Nicholas's hairline. We disagree.

In its motion to produce, the defense sought "all written or recorded verbatim statements" of "those persons whom the State expects to call as witnesses at the trial." At 1 a. m. on December 1, 1975, Coogan was acting as a police officer, not as a journalist. Not everyone can lay claim to the unique experience of having a 1975 maroon two-door Oldsmobile sedan[2] bear down on him on Washington Street in Providence during the early morning hours. Coogan's omission in the report is understandable, but Nicholas cannot complain for he received exactly what he asked for. The denial of the suppression motion was amply justified.

The defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the case is remanded to the Superior Court for further proceedings.

Aram K. Berberian, Warwick, for plaintiffs.

William Harvey, Newport, for defendant.

2. The information packet reveals that among the items seized following Nicholas's arrest was a 1975 Oldsmobile two-door maroon sedan.