393 So.2d 1312 (1981)
Teresa CARLISLE
v.
STATE of Mississippi.
No. 52348.
Supreme Court of Mississippi.
January 7, 1981.
Rehearing Denied March 4, 1981.
*1313 Albert S. Johnston, III, Karl A. Steinberger, Johnston & Steinberger, Pascagoula, for appellant.
Bill Allain, Atty. Gen. by Mark A. Chinn, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before SMITH, P.J., and SUGG and LEE, JJ.
SUGG, Justice, for the Court:
Defendant was convicted of murder and sentenced to life imprisonment by the Circuit Court of Jackson County, December 5, 1978. On appeal defendant assigns the following errors:
1. The court erred in overruling the defendant's motion to dismiss pursuant to Section 99-17-1, Mississippi Code of 1972, Amended.
2. The trial court erred in failing to exclude the testimony of state's witness Long.
3. The appellant did not receive a fair and impartial trial.
Defendant contends she was denied the right to a speedy trial under the provisions of section 99-17-1 Mississippi Code Annotated (Supp. 1976).[1]
Defendant has been tried four times, found guilty three times, and in another a mistrial resulted after a jury could not agree on a verdict. The chronology of the case follows:

October 14, 1975 Defendant indicted.
November 14, 1975 Defendant arraigned.
November 14, 1975 First trial  defendant convicted.
December 11, 1975 Motion for a new trial sustained.
January 12, 1976 Second trial  a mistrial was declared
 when the jury could not
 agree on a verdict.
February 10, 1976 Third trial  defendant convicted.
July 27, 1977 Defendant's conviction reversed
 by the Supreme Court  Carlisle
 v. State, 348 So.2d 765 (Miss.
 1977).
August 16, 1977 Supreme Court mandate issued.
December 4, 1978 Fourth trial  defendant convicted.

Defendant's fourth trial commenced December 4, 1978, which was 475 days after the mandate of the Supreme Court was filed in the Circuit Court of Jackson County. Section 9-7-49 Mississippi Code Annotated (1972) provides for four terms of Circuit Court to be held in Jackson County. The terms begin on the second Monday of April, the second Monday of July, the first Monday of October, and the second Monday of January in each year.
The case was set for trial during the October, 1977 term of court but was continued because of the absence of one of the witnesses for the state. No order of continuance was entered on the minutes of the court but counsel for defendant agreed that the case was continued because the subpoena on the witness was not served. The case was next set for trial during the January, 1978 term but was continued on motion of the defendant. The case was set for trial at the April, 1978 term but was again continued on motion of the defendant. The case was not tried during the July, 1977 term but her last trial began on December 4, 1978, at the next term of court.
The three continuances which were granted, one for the state and two for the *1314 defendant, should be deducted from the computation of the total time elapsed. The continuances were for a period of 282 days from the beginning of the October, 1977 term to the beginning of the July, 1978 term. After deducting the 282 days delay caused by continuances from the total time elapsed of 475 days, 193 days remain. Defendant was tried within 270 days of the filing of the Supreme Court mandate in the Circuit Court of Jackson County.
We have made the above computation to show that defendant was tried within 270 days of the date the mandate was filed; however, we are of the opinion that section 99-17-1 does not apply for the reasons hereinafter stated.
Some states take the position that under speedy trial statutes, a mistrial constitutes a trial and therefore the statutory period begins anew. Other states hold that when a mistrial results, the speedy trial statute has been complied with and the time for retrial is discretionary with the court. At least one state follows this approach with the additional requirement that the retrial must not be delayed longer than the time limitation provided by the speedy trial statute.
In Ruester v. Turner, 250 So.2d 264 (Fla. 1971) the Florida Supreme Court summarized the positions taken by other states with reference to speedy trial statutes after a mistrial and stated:
We now agree with those courts that have determined that if a mistrial results, compliance with the statutory requirements is satisfied. The time for retrial then becomes a matter of discretion with the trial court, which is to be measured by constitutional standards of reasonableness and fairness under the constitutional speedy trial right.... (250 So.2d at 267)
We agree with the conclusion stated in Ruester and hold that if a mistrial results, or if a case is reversed on appeal for retrial, compliance with section 99-17-1 is satisfied. The time for retrial then becomes a matter of discretion with the trial court to be measured by the constitutional standards of reasonableness and fairness under the constitutional right to a speedy trial as enunciated in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In Barker the United States Supreme Court announced a four part balancing test involving the following four factors:
1. Length of delay,
2. Reason for delay,
3. The defendant's assertion of his right,
4. Prejudice to the defendant.
The Supreme Court, in Barker, promulgated the balancing test because, "The right to a speedy trial is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied." The balancing test set forth in Barker must be applied on a case by case basis under the particular facts of the case under consideration.
Applying the Barker balancing test, we find that the case was delayed 475 days. Defendant had been twice convicted of murder but apparently was free on bond before her fourth trial because one of the witnesses for the state testified that the defendant moved into the same apartment complex that the witness lived in. The Supreme Court mandate was filed in the Jackson County Circuit Court on August 16, 1977, during the July, 1977 term which convened on July 11. This was an eight week term and only two weeks and four days remained during this term of court after the mandate was filed. Continuances were granted at the next three terms of court which carried the case to the July, 1978 term. At the July, 1978 term the judge presiding at the term had been appointed to act in the place of one of the circuit judges of Jackson County who was ill at that time. The presiding judge recused himself because defendant was a former client of his and he was associated with defense counsel at the time defendant employed defense counsel. The case was tried at the next term of court. We hold that, although there was a long delay from the time the mandate was filed in the trial court until *1315 defendant was tried, most of the delay was brought about by continuances which were granted, so we hold defendant was not denied a speedy trial under the first two factors of the balancing test.
It is also noted that the defendant did not assert her right to a speedy trial and she did not allege any prejudice that flowed from trial delay. When the four factors of the Barker balancing test are weighed in this case, we are of the opinion that defendant was not denied her right to a speedy trial.
Defendant next argues that testimony of Mrs. Jo Ann Gibson Long should have been excluded. The witness was placed on the stand and asked if she knew Tom Carlisle, the deceased. She responded, "I can't answer." The court excused the jury and the witness' attorney stated to the court in chambers that the prosecuting attorney was advised that the witness "was endangering her respect" and the witness refused to answer on the grounds it might incriminate her. He stated the witness would refuse to answer every question except her name and address. The court then noted that the witness could only invoke the Fifth Amendment on matters that would incriminate her. He stated that if the court could be shown where any question would be incriminating to the witness or cause her to be in jeopardy of criminal prosecution, he would listen to the attorney. The court noted, "It either has to be one of two things. Either you think she has perjured herself before, or is about to perjure herself at this time. Am I right?"
The attorney for the witness then stated that the witness had told the district attorney that she had been treated for drugs in the hospital and that she no longer had any memory of the events that took place at the time of Thomas Carlisle's death. He said he anticipated that the district attorney would charge her with perjury if she stated she did not have any recollection and for that reason he advised her to claim her Fifth Amendment rights. He suggested, "If the judge wants to grant her complete immunity that's in private with the court." He further stated that while the jury was out he wanted to get the ground rules laid as to the proper method for the witness to claim the Fifth. The district attorney then stated that he was willing to grant immunity if she said anything about the homicide that would incriminate her.
The court observed that the witness had testified three times and he could not see where there was any incrimination involved. The witness' attorney then asked, "Will they offer her immunity as to any possible perjury in the past?" The court said that if she had perjured herself in the past he would place her in the hands of the sheriff to await the action of the next grand jury. The jury was returned and the witness was again asked if she knew Tom Carlisle. The witness refused to answer on the grounds that it might incriminate her. The judge again excused the jury and she was again asked if she knew Tom Boy Carlisle. She answered:
I can't answer the question, I've tried so hard to block this out of my mind. I've been to three mental hospitals, in the past 3 years. I've been under about 5 different psychiatrists but I just can't remember none of it. I can't.
The court then remanded her to the custody of the sheriff, whereupon the witness' attorney requested permission to question the witness. In response to questioning the witness stated she could not recall because she had no memory due to her treatment for drugs and psychiatric treatment, whereupon the court interrupted and remanded her to jail.
The witness was recalled later and testified in detail about the homicide and was subject to a lengthy and searching cross-examination by one of the defendant's attorneys. On cross-examination defendant introduced the following affidavit:
Personally appeared before me, the undersigned authority in and for said county and state, the within named, Jo Ann Long, who being first duly sworn, states on oath that she is the affiant in this affidavit: that she has been a witness in Teresa Carlisle trials of the past: but, had a nagging worry that the testimony *1316 she gave may not have been the truth but the suggestions planted in her mind by "others".
That since the trials, she eventually had to be hospitalized in East Mississippi Hospital for drugs, and her present mental condition is such that she no longer has any memory or recollections of the events that took place at the time, during, and after Thomas Carlisle's death, and does therefore refuse to testify, on the grounds it may tend to incriminate her.
That this affidavit is not made through collusion, neither was I offered any promises of reward, nor intimidation of threats to make such, but the above and foregoing facts and allegations are true as therein stated to the best of my knowledge and belief.
/s/ Jo Ann Long
JO ANN LONG
Sworn to and subscribed before me this, the 2nd day of December, A.D. 1978.
Following are excerpts of the cross-examination of the witness by defendant's counsel.
Q. All right. I am calling your attention to about 2 months ago. Did you go to the Defendant's apartment at Oakwood Apartments and talk with her in the presence of another lady?
A. Yes.
Q. At that time, about 2 months ago, is that correct?
A. 2 or 3 that's right.
Q. And that was at Oakwood Apartments?
A. Yes.
Q. You lived in these apartments and so did the defendant, is that correct?
A. That's right.
Q. And at that point did you not tell the Defendant in the presence of this other lady, that you had done enough, that you didn't want to testify anymore and that you had lied before?
A. No sir, I never said that I had lied. I said I didn't want to testify again because I was tired of testifying. I've done it about 6 times and I don't get paid for it at work or nothing else and I'm sick of it.
Q. And did you not tell her in the presence of this other lady that you didn't know what happened at the time of the accident?
A. No sir. I knew what happened.
Q. Now subsequently to that, maybe 2 or 3 days later and on a weekend did you not come to my house?
A. Yes sir I did.
Q. In the presence of the Defendant?
A. Yes sir I did.
Q. At my house did you not ask me what would be the ramifications if you testified that you had not told the truth and if you changed your testimony what would your problems be? Did you not ask me that?
A. Would you repeat that question please?
Q. Did you ask me the question, tell me that you had not told the truth and if you changed your story what would be the ramifications and what would happen to you.
A. Mr. Johnston, the only thing I said was that I did not want to testify again.
Q. Did you not ask me to represent you?
A. I never asked you to represent me.
Q. Let me ask you this question. What was the purpose of coming to my house?
.....
A. It was because I think I was thinking at the time, that me and the Defendant have both been through a lot of nightmares and I thought if maybe I didn't testify it would help a lot. And besides it was getting my nerves so bad and everything and I've been to a lot of psychiatrists and they didn't even want me to think about this anymore. That's the reason I did it. I just have feelings for other people too.
.....
Q. When are you due for another treatment of Methadone?
A. Tomorrow.

*1317 Q. Tomorrow. Mrs. Long, has anyone said that they would take the Methadone away from you if you didn't testify today or yesterday?
A. No.
Q. No one?
A. No.
Q. Mrs. Long, after you were brought out of the jail, did you go over your testimony or part of it in the District Attorney's office?
A. Before I came back up here?
Q. Yes ma'm.
A. No. He offered me the paper to read and I told him I didn't want to even look at it.
Q. What paper?
A. My testimonies in the past.
.....
Q. Isn't it true that the reason that you didn't want to testify yesterday and today is because you're not sure that you are telling the truth?
A. Whatever I'm saying is the truth. Some of it I may not remember but what I'm saying is the truth.
Q. Isn't it true that you have told numerous people that you are sorry you had testified before?
A. I'm not sorry I testified. It's something I had to do.
.....
Q. Isn't it true that you signed an affidavit on December 2 stating that you were unsure of your testimony?
A. If you're talking about that statement I'd like to explain if I may?
Q. Go right ahead and explain.
A. There was a paragraph, if I could see it I could show somebody what I was talking about.
.....
Q. All right. I'll hand you the piece of paper you were going to explain.
A. Okay. I came to Mr. Ken Martin and I told him that I didn't want to testify again because of my nerves and I've been trying to block the whole thing out since the last time I testified. Okay, Mr. Martin had some fellow typing on the typewriter. I just came up there to talk to him, and the minute I was up there, he was typing all this bull up on the typewriter and he said now just sign this and so I said wait a minute, let me read it first. And I said now this first paragraph here where it says I may not have told the truth in the past, I said I don't want that put in there because that's a lie. I said that is a lie, the rest of it now I want you to put why I don't want to, and nothing like that. And he underlined, he said "may not have been the truth" he said that's just a legal term right there, "may not have been the truth" that don't necessarily mean that you lied before but it may not be the truth. He said now you don't want to testify do you, so you sign this. That's what he told me.
On redirect examination the witness stated that paragraph one of the affidavit was not true and explained:
A. This one was a lie. He told me if I wanted to get out of testifying I had to put that in there, I had to have some reason  He said that don't necessarily mean you lied in the past. It may not have been the truth is what he told me. And I said well I don't want to lie and he said you're not going to lie. I said "I don't want to." I said, "The only reason I want to get out of this, is because I want to block this whole thing out of my mind." I said, "I have never, never lied in the past."
Q. Okay. On how many occasions have you testified in this matter, please ma'm?
A. 1 preliminary and 3 other trials.
Q. To your knowledge, has your testimony been the same each time?
A. Yes. It's always been the same.
Q. To your knowledge, is there a transcript of your testimony right there on that table?
.....
Q. What was this Fifth Amendment thing you stated on the stand yesterday? What was that all about?

*1318 A. I didn't even know what he was talking about. Something to incriminate me. He told me I had to say that or I wouldn't even be able to not to testify at all if I didn't say that. And I said incriminate me about what, I haven't done anything I can think of to incriminate me.
.....
Q. You stated previously that you were on Methadone. He has asked you many questions about this Methadone. How long have you been on Methadone?
A. A year and a half.
Q. Do you have a job?
A. Yes I have a job.
Q. Where do you work?
A. I work at Litton in the x-ray department. I've been working there for three years.
Q. Have you continued your job along with this Methadone?
A. Yes I have.
Q. How long until you complete this program?
A. I'm almost through now. I'm on a very small amount right now. I never have dirty urine anymore.
Q. What does that mean?
A. That means I'm clean. I've been clean. They check spontaneously or they don't let you stay on the program.
Q. I can't ask you a leading question, but tell me what that means?
A. Well, they just, you have a urine check spontaneously maybe 2 or 3 times a week. If you come up bad twice you're off the program.
Q. What does bad mean?
A. If you show any type of narcotics in your bloodstream or in your urine, you can't stay on the program.
Q. Are there any other reasons you didn't want to testify? In this trial? Besides you just want to block it out of your memory?
A. I guess I was just scared.
Q. What were you scared of?
A. Just a lot of things.
Q. Could you be specific?
A. Well mainly I guess, the Defendant.
Q. And who is that?
A. Teresa Carlisle.
It is obvious the witness did not desire to testify another time in the murder trial and that she had consciously tried to block the memory of the incident out of her mind. Obviously she was not successful in blocking the facts out of her mind because she testified in detail about the homicide. The record shows that the transcripts of the former trials were available in the courtroom and we feel certain if her testimony varied in any respect such variance would have been pointed out to us by defense counsel. No variance has been shown.
Although the witness was on the Methadone treatment for withdrawal from drugs, she had been gainfully employed for three years, was nearing the end of the Methadone treatment, and was free of drugs. We hold the witness was competent and the judge did not abuse his discretion in handling this very delicate situation during the trial.
In her third assignment of error, defendant claimed she did not receive a fair and impartial trial and stated in her brief the following:
Appellant believes that if ever given the chance to have a simple straight forward presentation of facts at a trial, the jury will acquit her. Appellant requests that this Honorable Court give her that chance and reverse and remand this cause for a new trial.
A review of the entire record reveals that defendant was afforded the opportunity to present her defense. In this assignment of error she again claims she was denied the right of a speedy trial and that the confusion attending the refusal of the witness Long to testify when called to the stand for the first two times in some manner kept her from receiving a fair and impartial trial.
We are of the opinion that defendant did receive a fair and impartial trial. She has been found guilty by three different juries. Finding no reversible error, we affirm.
AFFIRMED.
*1319 PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and WALKER, BROOM, LEE and BOWLING, JJ., concur.
NOTES
[1] Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.