MR. JUSTICE SHEEHY,
dissenting:
I dissent. We should grant supervisory control and make a final determination in this cause as to whether Forsyth is receiving a speedy trial, whether he was prejudiced by the actions of the bailiff in the prior trial, and whether the District Court improperly changed the place of trial.
It had already been established in this case that Flathead County was not a place where a defendant could receive a fair trial. Because of that determination, the cause had been transferred to Lake County, where the second trial against Forsyth was held. After the hung jury occurred, a new district judge retransferred the case to Flathead County and ordered that a jury from Toole County be brought in to hear the case. There is no suggestion that the trial jury will be sequestered when it is brought into Flathead County.
The majority brush this very substantial issue off the table by stating that “we find nothing in the record to suggest that injustice would result from a denial of supervisory relief.” That statement is true. It is equally true that the majority could find nothing in the record to suggest that justice would result from a denial of supervisory relief. The reason is that the District Court made no findings, had no evidence before it that a fair trial could result in Flathead County with an imported jury. The decision to import the jury to Flathead County was made by the District Court on its own, following a suggestion made without record support by the prosecution.
The statutory authority under which the District Court is presuming to act seems to indicate that a jury may only be imported to the county where the action is pending. Section 46-13-203(3)(b), MCA, states:
“(b) Direct that a jury be selected in any county where a fair trial may be had and then return to the county where the prosecution is pending to try the case . . .”
The following subsection of the same statute, sec. 46-13-203(3)(c), *491 MCA, allows the court to take “any other action designed to insure that a fair trial may be had.” What is utterly lacking in the record before us is evidentiary support that the action of the court in re-transferring the cause to Flathead County with an imported jury is designed to insure that a fair trial may be had.
No one, not any justice of this Court, any district judge, or any attorney involved in this case, could reasonably now assert that Flathead County, in itself could provide defendant a fair trial. The very fact that the District Court ordered an imported jury for Flathead County emphasizes the poisoned atmosphere in the county. There may be ways to insulate the imported jury from that atmosphere, but nothing in the record suggests how it may be done. There is a complete lack of proof that the imported jury is “designed to insure that a fair trial may be had.”
JURY TAMPERING
The bailiff during the second trial was Clarence Bourne. He made 10 improper comments in the presence of the jurors while the trial was in progress. The District Court whitewashed the improper statements of the bailiff on the irrelevant ground that the bailiff was not motivated by a desire or attempt to influence the jurors’ perception of the trial or to effect their deliberations; and the District Court further, having divined in some manner the judgmental operations of the minds of the jurors found that none of the bailiffs’ comments influenced the attitude, perception or ultimate judgment of any juror.
Although the majority opinion states that Forsyth “contended” that improper comments had been made, the record shows clearly that the improper comments were in fact made by the bailiff.
1. Following the testimony of Debbi Neff, a former girlfriend of Forsyth, the bailiff told members of the jury that she must have been drugged to testify, that “you should see in her medicine cabinet,” implying that she was a drug abuser, and that she had nearly “blown it” at the first trial.
2. On another occasion during the trial, he told members of the jury “I can say just one word and it would remove all doubt from your mind.”
3. While the court and counsel were in chambers during the course of the trial, and the jurors were curious about what was going on in chambers, the bailiff stated that the county attorney, or the county attorney and defense counsel, or that the judge and the attorneys *492 would come in after the trial “and tell you all the things you didn’t get to know during the trial and he would answer your questions.” One of the jurors stated that she feared during deliberations that if she voted not guilty and then the county attorney came in and told her about important evidence which had been suppressed, she was concerned that she may have voted the wrong way.
4. The bailiff informed members of the jury that his son was a member of the Kalispell police department which was involved in the prosecution of the action against Forsyth.
5. During the lengthy days’ long cross-examination of the State’s principal witness by defense counsel, the bailiff made the remark on several occasions to members of the jury “we know who is getting paid by the hour,” imputing deliberate delay to defense counsel.
6. During the trial, when distributing to the jurors their first expense checks, the bailiff told the jury that the cost of the trial to the State had already reached $6,000.
7. The bailiff pointed out to the jurors the parents of the victim who were seated in the courtroom.
8. When the jurors went to the scene of the crime, they were told to stay together because “they were afraid that something would happen or some comment would be made that they would get a retrial.”
9. The jurors wanted to send a Christmas gift to one of the witnesses, Norman Calvert, and Bourne volunteered to ask his son, as a member of the Kalispell Police Department to insure that Calvert received it.
10. The jury began deliberating the case after it was submitted to it on New Year’s Eve, December 31, 1982. Bourne told the jury that the Flathead County jury in the earlier case had deliberated for approximately 8 hours and that therefore the jurors in this case might anticipate reaching a conclusion in time for a “Happy New Year”.
That is the record on which the majority find “substantial evidence to support the District Court’s findings” and decline to issue supervisory relief.
SPEEDY TRIAL
From January 2, 1983, the date of the hung-jury decision, to September 24, 1984, the date when petitioner filed his application for a writ in this Court for supervisory control, 631 days have elapsed. In a Janus-like decision (the Roman God who faced both ways), the majority declines to rule on the sufficiency of evidence to prove a *493 denial of speedy trial, but finds from its review of the record that there is substantial evidence to support the findings of fact and conclusions of law of the District Court that Forsyth has not been denied a speedy trial. Particularly the Court finds no “emergency” which would warrant the acceptance of this cause for supervisory relief.
Following the hung-jury trial, the defendant, having become indigent, moved the District Court (1) for a transcript of the hung-jury trial, and (2) for the appointment by the Court at public expense of his attorneys Keller and Gilmer (now Keller and German) to further represent him. The District Court insisted on appointing the two public defenders of Flathead County instead of the firm that had taken Forsyth through two homicide trials.
On the issue of his right to effective assistance of counsel, Forsyth petitioned this Court in cause No. 83-129 that the District Court be overruled and that the Keller firm be continued as his attorneys. That petition was filed March 17, 1983. About 112 days later, on July 7, 1983, this Court denied Forsyth relief.
Following our order denying relief, it developed that the county defenders did in fact have a conflict of interest and could not represent Forsyth. The District Court could not be moved however, and so Forsyth filed a second petition for supervisory relief, in cause No. 83-403. In that case, we determined that he was in fact entitled to effective assistance of counsel and directed the District Court to appoint the Keller firm to represent Forsyth. The petition in cause No. 83-403 was filed on August 29, 1983. The decision of this Court went down on October 31, 1983, 63 days later.
With respect to the transcript, following the hung-jury trial, the defense counsel moved for a full transcript of the hung-jury trial, except for those portions of the testimony that had gone in by deposition. The District Court on November 14, 1983, ordered a partial transcript of the hung-jury trial, restricted to the testimony of the defendant and the testimony of the State’s witnesses. On January 13, 1984, the trial judge on motion of Forsyth, ordered the remainder of the transcript to be furnished to Forsyth.
The right to a speedy trial is guaranteed both by the state and federal constitutions. The right to due process is guaranteed both by the state and federal constitutions. Without a proper transcript of the 1982 trial, Forsyth would have been deprived of due process without doubt, if he were convicted in a third trial. In order to procure effective assistance of counsel, it was necessary for him twice to *494 come before this Court for supervisory relief. In effect, he was enforcing his right to constitutional guarantees which had been denied him by the District Court and by the prosecution. The time that the defendant has spent in defending himself from the improper actions of the District Court and the prosecution are being charged against him now in considering the speedy trial issue. The sop to Forsyth that he can raise this issue again on appeal if convicted is transparent. The majority finding that substantial evidence supports the District Court’s findings on the speedy trial issue is a harbinger of things to come.
RIGHT TO SUPERVISORY CONTROL
The majority opinion is careful to state that in order to provide supervisory relief, the petitioner must show circumstances of an emergency nature, making consideration of errors the trial level through an appeal to this Court an inadequate remedy. On the issue of jury tampering, on the issue of speedy trial, on the issue of change of place of trial, as presented in this case, I can imagine no weightier case coming before this Court. I would issue a writ of supervisory control, and decide the issues presented in this cause after oral argument.
MR. JUSTICES MORRISON and SHEA join in the foregoing dissent.
ON PETITION FOR RECONSIDERATION
MR. CHIEF JUSTICE WEBER:
The trial of defendant Jerry Paul Forsyth in the Lake County District Court on a charge of deliberate homicide resulted in a mistrial because of jury deadlock. Defendant filed a petition for writ of supervisory control claiming double jeopardy, denial of speedy trial and error of the District Court in ordering a change in the place of trial. By opinion dated January 3, 1985, this Court declined to take jurisdiction under the petition for writ of supervisory control. Defendant filed a petition for reconsideration, and briefing and oral argument was ordered. We again decline to accept jurisdiction under the petition for supervisory control.
The issues which we will consider in this additional opinion are:
1. Do the Double Jeopardy Clauses of the Montana and United States Constitutions bar retrial of the defendant?
*495 2. Should this Court grant a pretrial review of the speedy trial question?
3. Did the District Court err in ordering a change of place of trial?
The extensive facts of this case are set forth in some detail in our opinion dated January 3, 1985 and will not be restated here, except to the extent necessary to explain our analysis of the legal issues.
I
Do the Double Jeopardy Clauses of the Montana and United States Constitutions bar retrial of the defendant?
Defendant argues that the double jeopardy provisions of the Montana and Federal Constitutions bar retrial. He contends that the misconduct on the part of the bailiff is chargeable to the State in the same manner as misconduct committed by a prosecutor or a judge.
The State argues that jeopardy was not terminated by the declared mistrial following a jury deadlock. The State further argues that there is no standard which bars retrial under the present facts.
It is first necessary to determine whether there has been any double jeopardy following a mistrial as a result of a hung jury. Richardson v. United States (1984), _U.S__, 104 S.Ct. 3081, 82 L.Ed.2d 242, carefully analyzed the question of whether double jeopardy had resulted in a fact situation similar to the present Forsyth case. In Richardson, the petitioner argued that the judicial declaration of a mistrial was an event that terminated jeopardy and allowed him to assert a valid claim of double jeopardy. The United States Supreme Court stated:
“We think that the principles governing our decision in Burkes, and the principles governing our decisions in the hung jury cases, are readily reconciled when we recognize that the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy ... an event which terminated jeopardy in his case and which allowed him to assert a valid claim of double jeopardy.
“But this proposition is irreconcilable with cases such as Perez and Logan, and we hold on the authority of these cases that the failure of the jury to reach a verdict is not an event which terminates jeopardy . . . Justice Holmes’ aphorism that ‘a page of history is worth a volume of logic’ sensibly applies here, and we reaffirm the proposition that a trial court’s declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which *496 petitioner was subjected. The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree.” Richardson, 104 S.Ct. at 3086 (Emphasis added.)
We conclude that in Montana a mistrial following a hung jury, as in the present case, does not terminate the original jeopardy. Defendant argues for an exception to this rule. It is true that Oregon v. Kennedy (1982), 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416, sets forth one exception. The Court held in Oregon v. Kennedy that where governmental conduct giving rise to a motion for mistrial was intended to provoke the defendant into moving for a mistrial, then retrial might properly be prohibited. Defendant argues for an even stricter standard as set forth by the Oregon Supreme Court in State v. Kennedy (1983), 295 Or. 260, 666 P.2d 1316.
The transcript demonstrates that the comments on the part of the bailiff were not intended to provoke the defendant to move for a mistrial. We do not in any way approve of this type of comment by a bailiff. However, in the present case, the comments could at most be construed as an attempt to assist the State in obtaining a conviction. No conviction was obtained. The jury was unable to agree and a mistrial was granted. Under the specific circumstances of this case, we conclude that the defendant has not come within the Oregon v. Kennedy exception. We also conclude that the bailiff’s comments were not so offensive as to require a dismissal, and we decline to adopt a standard similar to that of State v. Kennedy.
In a similar manner with regard to the alleged prosecutorial misconduct, we conclude that the record does not demonstrate an attempt by the prosecution to provoke a mistrial. The conduct was ineffective if the aim was to obtain a conviction.
We hold that the Double Jeopardy Clauses of both the Montana and United States Constitution do not bar retrial of the defendant for the following reasons:
1. Because the original jeopardy continued without change following the hung jury and declaration of mistrial, the defendant was not placed in double jeopardy.
2. In addition, the facts do not warrant a conclusion that the defendant presented a colorable double jeopardy claim.
*497 II
Should this Court grant a pretrial review of the speedy trial question?
Defendant in substance contends that the criminal proceedings should be dismissed because he has been denied a speedy trial. Six hundred thirty days had elapsed since the second trial and hung jury. Defendant makes an extensive argument with regard to the various reasons for this extensive delay, arguing that basically all of the delay is chargeable to the State.
The State argues that the delay is largely due to the defendant’s procedural tactics, pointing out that the State has not been independently dilatory. The State makes extensive reference to the order of the District Court of May 23,1984, pointing out that virtually all of the delay was attributable to the defendant’s various motions and supervisory writ proceeding before this Court.
Because we do not conclude that this issue is ripe for review, we will not discuss the facts in detail or attempt to weigh the same.
United States v. McDonald (1978), 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18, contains an extensive discussion of the United States Supreme Court’s reasoning in reaching a conclusion that, before trial, a defendant may not appeal an order denying his motion to dismiss for violation of his Sixth Amendment right to speedy trial. In February 1970, the wife and two daughters of Captain McDonald were murdered in his quarters on a military base. The Army charged McDonald with the murders, but after further investigation, the charges were dismissed and McDonald was honorably discharged. His discharge barred any further military proceedings. After further investigation and almost five years later, a grand jury indicted McDonald on three counts of first degree murder in January 1975.
McDonald sought dismissal of the indictment because he had been denied a speedy trial. The Court concluded that the double jeopardy holding could not be applied to the issue of speedy trial.
“In sharp distinction to a denial of a motion to dismiss on double jeopardy grounds, a denial of a motion to dismiss on speedy trial grounds does not represent ‘a complete, formal and, in the trial court, a final rejection’ of the defendant’s claim. Abney v. United States, 431 U.S. [651] at 659, [97 S.Ct. 2034, 2040, 52 L.Ed.2d 651 (1977)]. The resolution of a speedy trial claim necessitates a careful assessment of the particular facts of the case. As it reflected in the decisions of this Court, most speedy trial claims, therefore, are best *498 considered only after the relevant facts have been developed at a trial.
“In Barker v. Wingo, 407 U.S. 514, [92 S.Ct. 2182, 33 L.Ed.2d 101] (1972), the Court listed four factors that are to be weighed in determining whether an accused has been deprived of his Sixth Amendment right to a speedy trial. They are the length of the delay, the reason for the delay, whether the defendant has asserted his right, and prejudice to the defendant from the delay. Id., at 530. The Court noted that prejudice to the defendant must be considered in the light of the interests the speedy trial right was designed to protect: ‘(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system,’ . . .
“Before trial, of course, an estimate of the degree to which delay has impaired an adequate defense tends to be speculative. The denial of a pretrial motion to dismiss an indictment on speedy trial grounds does not indicate that a like motion made after trial — when prejudice can be better gauged — would also be denied. Hence, pretrial denial of a speedy trial claim can never be considered a complete, formal, and final rejection by the trial court of the defendant’s contention; . . .
“Even if the degree of prejudice could be accurately measured before trial, a speedy trial claim nonetheless would not be sufficiently independent of the outcome of the trial to warrant pretrial appellate review. The claim would be largely satisfied by an acquittal resulting from the prosecution’s failure to carry its burden of proof. The double jeopardy motion in Abney was separable from the issues at trial ... In contrast, a central interest served by the Speedy Trial Clause is the protection of the fact-finding process at trial. The essence of a defendant’s Sixth Amendment claim in the usual case is that the passage of time has frustrated his ability to establish his innocence of the crime charged. Normally, it is only after trial that that claim may fairly be assessed.
“. . . Unlike the protection afforded by the Double Jeopardy Clause, the Speedy Trial Clause does not, either on its face or according to the decisions of this Court, encompass a ‘right not to be tried’ which must be upheld prior to trial if it is to be enjoyed at all. It is the delay before trial, not the trial itself, that offends against *499 the constitutional guarantee of a speedy trial. If the factors outlined in Barker v. Wingo, supra, combine to deprive an accused of his right to a speedy trial, that loss, by definition, occurs before trial. Proceeding with the trial does not cause or compound the deprivation already suffered.” MacDonald, 435 U.S. at 858-61, 98 S.Ct. at 1551-53 (Emphasis added.)
In MacDonald, the court pointed out a speedy trial problem which can result from any form of intermediate appeal.
“Many defendants, of course, would be willing to tolerate the delay in a trial that is attendant upon a pretrial appeal in the hope of winning that appeal. The right to a speedy trial, however, ‘is generically different from any of the other rights enshrined in the Constitution for the protection of the accused’ because ‘there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused.’ Barker v. Wingo, . . . Among other things, delay may prejudice the prosecution’s ability to provide its case . . . and prolong the period during which defendants released on bail may commit other crimes . . .
“Allowing an exception to the rule against pretrial appeals in criminal cases for speedy trial claims would threaten precisely the values manifested in the Speedy Trial Clause. And some assertions of delay-caused prejudice would become self-fulfilling prophecies during the period necessary for appeal.” MacDonald, 435 U.S. at 862, 98 S.Ct. at 1553. (Emphasis added.)
In his diligent representation of the defendant, defendant’s counsel has come before this Court a number of times on petitions for supervisory control. We in turn have taken extensive time to consider the petitions, to hear oral arguments and ultimately to give opinions, some of which granted supervisory control and some of which denied it. All of these proceedings, which are in the nature of an intermediate appeal, have become a part of the great delay which raises the speedy trial issue in this case. This underscores the difficult balancing problem this Court has in considering petitions for supervisory control, while seeking to protect the constitutional right of a speedy trial. Unfortunately, these ideas are in substantial part directly conflicting. However, we conclude that we need not reach a decision on the speedy trial question at this time.
We approve and adopt the reasoning quoted above from MacDonald. We hold that defendant’s claim of a denial of his right to speedy trial is generically different from his claim of double jeopardy. We conclude that the contentions on the part of the defendant *500 that he has been denied a speedy trial cannot be considered until the retrial is held and all of the facts are presented to this Court on appeal. At that time, the issue will be ready for decision. At the present time, the record is not sufficiently complete to allow a decision on the speedy trial issue.
We hold that the defendant is not entitled to supervisory control on his claim of denial of speedy trial.
Ill
Did the District Court err in ordering a change of place of trial?
Defendant argues that he has met a considerable burden in initially obtaining a change of venue from Flathead County to Lake County. As appears from our original opinion, the trial court is granted the discretion to determine the place of trial and the procedures to be followed. In advance of trial, we are not able to determine if local prejudice in Flathead County might have some effect on the retrial. We should not presume in advance that the District Court and the State will not use appropriate procedures to protect the integrity of the jury process from any taint which may be present in Flathead County because of local prejudice. However, for the benefit of the District Court and counsel, we emphasize the need for stringent controls to insulate the trial jury from any local prejudice. We insist that appropriate steps be taken to insure a fair third trial.
We conclude that the District Court-did not err in ordering the change of place of trial.
The petition for supervisory control is denied in all respects.
MR. CHIEF JUSTICE TURNAGE and MR. JUSTICES HARRISON and GULBRANDSON concur.