**Marlin Douglas ANDERSON,
Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 07–99–0134–CR.

Court of Appeals of Texas,
Amarillo.

Dec. 1, 1999.

Mike Smith, Law Office of Mike Smith, Lubbock, for appellant.

William C. Sowder, Criminal Dist. Atty., Wade Jackson, Asst. Criminal Dist. Atty., Lubbock County Dist. Attys. Office, Lubbock, for appellee.

Before QUINN and REAVIS and JOHNSON, JJ.

BRIAN QUINN, Justice.

Marlin Douglas Anderson (appellant) appeals his conviction for the aggravated sexual assault of a child and asserts three issues. The first two concern the violation of his right to a speedy trial as guaranteed through the United States and Texas Constitutions, and the third deals with the factual sufficiency of the evidence. We affirm.

### Facts

In June of 1989, appellant was living with his common law wife and her ten-year-old daughter, T. T. would visit her father in Austin, Texas during the summer for two weeks, and it was during this summer visit in July, 1989 that T. made an "outcry" statement to her step-mother regarding sexual abuse by appellant. T. told her step-mother that appellant, prior to her coming to Austin, had entered her room with a flashlight, got into bed with her and laid on top of her. He then pulled her panties down and placed his penis inside her. Furthermore, she was unable to scream or try and get away from him because she was too scared.

T. was taken to Dr. Nauert to be examined for possible sexual abuse. It was determined that she had been sexually abused and had contracted chlamydia, a sexually transmitted disease. She was treated with antibiotics. Both T.'s mother

and appellant were tested for chlamydia and both tested negative.

Appellant was initially indicted in November of 1989. His first trial, which was held in April of 1991, resulted in a conviction. The latter was subsequently reversed by this court and the cause was remanded for further proceedings. Thereafter, the state re-indicted him in November of 1992 for the same offense, but changed the date upon which the offense allegedly occurred. However, trial upon the charge was not held until March of 1999.

During the six and one-half year interim between re-indictment and retrial, the state had announced ready on several occasions, the earliest being on November 10, 1992. So too was the cause set for trial approximately seven times between November of 1992 and November of 1994. At least two of those trial dates were passed at the behest of appellant, who moved for continuances. But, why trial was not had upon any of the other dates is unknown.

Thereafter, the cause remained unexplainably dormant until January of 1997, when it again began to be assigned various trial settings. As before, for unknown reasons, the cause was never reached for trial. Eventually, the court set the matter for trial to begin on March 29, 1999. Three days prior to that setting, appellant (through new trial counsel that had been assigned in August of 1998) filed his "Motion to Set Aside Indictment for Denial of Speedy Trial." That motion was heard on March 26, 1999.

During the proceeding, the court entertained argument of counsel and received evidence. So too did it judicially note that from the time the case was filed until the day of the dismissal hearing, there were "between 400 and 500 felonies" pending on its docket and that it dealt with at least 50 cases at each docket call. The court further stated that 1) "[t]his case [had] been set for trial numerous times ... was continued at the defendant's request ... twice with formal motions for continuance," 2)

there were "several resets and passes on the docket sheet that are noted from several of the trial settings," 3) that "[i]t would appear that the case was set for trial in October of '94, and it was passed at that time," 4) it did not know why the cause was passed in October of 1994, 5) the proceeding "was not set again on the docket until January of 1997," and 6) the court "sets its own dockets" but could not "give a reason" for the case "not being set between November of '94 and January of '97." Then, it found that 1) "there [was] no fault in the delay on the part of the defendant, other than the two motions for continuance, and blame [could not] be assessed the defendant because of his counsel's busy schedule ...," 2) the delay was "purely and simply the nature of the overcrowded conditions of the court's docket," and 3) "that blame [could not] be assessed the state for [the] delay." With this said, the motion was denied and trial ensued.

Upon trial, appellant was again convicted of aggravated sexual assault. His punishment was assessed at 99 years imprisonment.

### Issues One and Two—Speedy Trial

*a. Substantive Law and Standard of Review*

■■■ The right to a speedy trial encompasses not only the mere right to speed but also to an "orderly expedition" of the charge. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 459–60, 30 L.Ed.2d 468 (1971); *State v. Munoz*, 991 S.W.2d 818, 821 (Tex.Crim.App.1999). And, in determining whether both were afforded the accused, the United States Supreme Court announced in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), that four indicia must be balanced. They consist of the 1) length of the delay, 2) reason for the delay, 3) time at which the defendant asserted the right, and 4) prejudice, if any, suffered by the defendant due to the delay. *Barker v. Wingo*, 407 U.S. at 530, 92 S.Ct. at 2192–

93, 33 L.Ed.2d at 116–17; *Johnson v. State*, 954 S.W.2d 770, 771 (Tex.Crim.App. 1997). Inherent in factors two and three is an assessment of the conduct of both the state and defendant. *State v. Munoz*, 991 S.W.2d at 821 (citing *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118). Furthermore, while "[n]o single ... factor is a 'necessary or sufficient condition to the finding' of a speedy trial violation," *State v. Munoz*, 991 S.W.2d at 821; *Barker v. Wingo*, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118, it is necessary that the court first find an undue delay. Simply put, if there is no such delay, then there is no reason to address the remaining indicia.

■ Next, in analyzing the trial court's decision, the reviewing court balances the four factors anew. *Johnson v. State*, 954 S.W.2d at 771. That is, while the trial court's resolution of the historical facts particular to the case is entitled to our deference, *State v. Munoz*, 991 S.W.2d at 821, application of those facts to the four indicia itemized above involves a question of law. *Johnson v. State*, 954 S.W.2d at 771. And, being a question of law, it undergoes review *de novo*. *State v. Munoz*, 991 S.W.2d at 821; *Johnson v. State*, 954 S.W.2d at 771.

### b. Application of Law

■ Here, the facts relevant to appellant's speedy trial claim are generally undisputed. Our task, therefore, involves applying those facts to the *Barker* criteria. We do so now.

### i. Length of Delay

The delay at bar exceeded 6 years. Given that the 17 month lapse existent in *Munoz* was deemed sufficiently prejudicial to trigger consideration of the remaining *Barker* factors, we conclude that the span before us does so as well.

### ii. Reason for the Delay

The appellant twice moved for continuance. Each undoubtedly postponed resolution of the cause to some extent. Yet, those facts did not then, and do not now, explain why trial was delayed as it was. Nor could the onus be placed upon the state for it had consistently announced that it was ready for trial.

■ Furthermore, we do not accept the appellant's insinuation that the state should be charged with the delay because it had the obligation to have its allegations tried. Admittedly, the state is the party seeking to convict appellant. As such, it must timely prepare for trial. Yet, preparing its case for trial is the only aspect of the proceeding over which it has extensive control. It cannot legally or theoretically determine when trial will be had; that task falls within the rather exclusive bailiwick of the trial judge. The trial judge has the power to control its docket, as it must have. And, inherent in that power lies the ultimate authority to control when a particular case is tried.[1] Indeed, the trial court at bar recognized this truism. And, because it attributed the delay here to the size of its felony docket and its own scheduling, it found neither litigant responsible.[2]

In short, the reasons for the delay are " 'more neutral' " and compare to such things as " 'negligence or overcrowded courts'." *State v. Munoz*, 991 S.W.2d at 822, *quoting*, *Barker v. Wingo*, *supra*. Consequently, they weigh " 'less heavily' " against the state than they would weigh if the state deliberately endeavored to postpone trial. *State v. Munoz*, 991 S.W.2d at 822.

### iii. Assertion of Right

The fact that neither appellant nor his counsel invoked the right to a speedy trial until March of 1999 is undisputed. Simi-

---

1. Of course, appellate courts may under appropriate circumstances interfere with that power via mandamus.

2. That the delay was caused by the court's trial docket and scheduling not only finds support in the record but is effectively undisputed.

larly undisputed is that within three days of invoking the right, appellant received his trial.

So too does the record show that appellant never formally requested a trial setting but, instead, nullified at least two settings by requesting and obtaining continuances. Appellant attempts to ameliorate the effect of these circumstances by citing a lack of communication between himself and the attorney appointed to represent him prior to August, 1998. Yet, there is no evidence of record indicating how many times, if any, appellant attempted to contact his attorney about this cause. And, while he did testify that he broached the matter with at least one of his two attorneys, nothing of record identifies that particular attorney or when the matter was raised. It could well be that he waited to speak to anyone until shortly before the date upon which he eventually moved for dismissal. Moreover, if appellant was dissatisfied with the purported lethargy of his pre-August 1998 attorney, nothing of record explains why he waited six years to hire counsel who would urge the right to a speedy trial. Nor is there evidence of record explaining why appellant waited an additional eight months to urge the right after obtaining new counsel or why he waited to move to dismiss until the eve of trial. This dearth of explanation and evidence raises serious question regarding the veracity of his contention that he desired a speedy trial.

Similarly hollow is the suggestion that appellant felt he need not have invoked his right because the court was assigning trial dates to the cause. As with many of his other contentions, no evidence of record suggests, much less illustrates, that either he or his attorney was somehow duped into believing assertion of the right to a speedy trial was unnecessary due to the court's actions. Moreover, that the settings were continually passed without the case being tried renders specious the notion that a trial setting would have resulted in a trial of this particular case.

Additionally, for over two years, the cause was not even being set, and, during this time, no one complained to the court. Given this fact, it can hardly be suggested that appellant was relieved from having to invoke his right to a speedy trial because the case was purportedly being scheduled for trial.

■ While it is no longer the rule that the failure to expressly demand a speedy trial *ipso facto* results in the loss of that right, *Barker v. Wingo,* 407 U.S. at 528, 92 S.Ct. at 2192, 33 L.Ed.2d at 115–16; *State v. Munoz,* 991 S.W.2d at 825, the accused nonetheless has the responsibility to assert it. *Id.* His failure to do so "make[s] it difficult for ... [him] to prove that he was denied a speedy trial, and, furthermore, can be a strong indication that he did not want one." *Id.*

Despite appellant's contentions to the contrary, the record depicts that he withheld his claim for a speedy trial for over six years, and, when the matter was finally broached, he did not seek a speedy trial, but rather a dismissal. *See Degarmo v. State,* 922 S.W.2d 256, 266 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd.) (stating that a defendant's motivation in asking for dismissal, as opposed to a prompt trial, is clearly relevant and may attenuate the strength of his speedy trial claim). This, coupled with the facts that he 1) remained unincarcerated while the cause was pending (as discussed below), and 2) knew his prior trial resulted in a conviction and lengthy prison sentence, provides "strong indication that he did not want" a speedy trial. *Barker v. Wingo,* 407 U.S. at 528, 92 S.Ct. at 2192, 33 L.Ed.2d at 115–16.

*iv. Prejudice*

■ The last factor we address is prejudice. According to precedent, it must be assessed with an eye towards the interests which the right to a speedy trial was designed to protect. *State v. Munoz,* 991 S.W.2d at 826. Those interests consist of 1) preventing oppressive pretrial incarceration, 2) minimizing anxiety and con-

cern of the accused, and 3) limiting the chance that the accused's defense will be impaired. *Id.* Of these indicia, the last is most important since the inability to adequately defend one's self affects the fairness of the entire system. *Id.* And, while unsaid by most courts, it is nonetheless a necessity that the prejudice in question emanate from the delay. In other words, there must be a causal relationship between the two. If this were not so, then logically the factor would be of no importance.

With the foregoing said, we turn to the record before us and immediately note that appellant was not incarcerated while awaiting adjudication. That this is true is evinced by his testimony regarding effort to gain and maintain employment throughout the interim. Had he been jailed, he would not have been able to seek work. And, despite his testimony that he and his family remained anxious throughout the period and that he even lost employment opportunities, we cannot say that the circumstances were solely caused by the delay. Again, as discussed above, appellant did not formally demand a speedy trial for over six years. And, when he finally did, the court tried him within several days of his doing so.[3] The court's action in response to the formal demand is some evidence that had appellant asserted the right earlier, the anxiety purportedly experienced by him and his family, as well as the missed employment opportunities, may have been minimized. In sum, he controlled means which could have been used to mitigate his situation and because he did not use them, he exacerbated that situation.

Next, appellant posits that he was harmed because two witnesses who testified favorably for him at the first trial did not testify at the second. The first, Sarah Blocker, died in 1994. Nevertheless, her testimony was not only available, but also presented to the jury at the second proceeding via the submission of excerpts from the transcript of the first prosecution.[4] And, while the litigants agreed at oral argument that live, as opposed to written, testimony may have a greater impact upon a jury, appellant nonetheless had the testimony he desired. Thus, the death of Blocker cannot be said to have imposed much hardship upon appellant.

As for the second witness, James Tarlton, we note that appellant failed to assert at the hearing upon his speedy trial motion that Tarlton's supposed unavailability somehow prejudiced him. Indeed, Tarlton was not even mentioned at that proceeding. Appellant's having said nothing about that witness, it is questionable whether he preserved complaint regarding his absence. Nevertheless, three other reasons compel us to find little prejudice in this witness's purported unavailability.

First, Tarlton allegedly left the state of Texas sometime after testifying at the first trial. But when Tarlton left is unknown, for the record says nothing about that. Thus, the witness might never have been available to testify regardless of when the trial actually occurred. Given the absence of all evidence about the date of departure, any nexus between the delay and Tarlton's supposed unavailability is suspect at best.

Second, the record at bar merely depicts that Tarlton had left Texas and, therefore, was outside the court's subpoena power. Indeed, the subpoena appellant attempted to serve upon Tarlton was returned unserved, apparently because of his absence from Texas. Yet, nothing of record illustrates that any other efforts were made by appellant to obtain Tarlton's testimony, nor does it disclose whether or not

---

3. The trial court stated at the hearing upon appellant's request to dismiss the prosecution, that its practice was to afford a speedy trial to those invoking the right. That statement was proven true when appellant was tried within several days of his assertion of the right.

4. Excerpts from the first trial encompassing Blocker's testimony were admitted into evidence for the jury to read.

the witness would have voluntarily appeared at trial if asked to do so by appellant. All we have before us is a failed attempt to subpoena Tarlton. Because of this, it can hardly be said that appellant exercised due diligence in trying to secure Tarlton's presence, which effort was required of appellant before he could claim that the witness's unavailability prejudiced him. *Swisher v. State*, 544 S.W.2d 379, 382 (Tex.Crim.App.1976). So too does this dearth of effort render questionable the argument that Tarlton was actually unavailable. As we held in *Otero–Miranda v. State*, 746 S.W.2d 352 (Tex.App.—Amarillo 1988, pet. ref'd), the mere inability to subpoena someone does not *ipso facto* render that person unavailable to testify. *Otero–Miranda v. State*, 746 S.W.2d at 355. The complaining party must also show that he undertook other reasonable measures to secure the witness's presence, *id.*, which the appellant at bar did not do.

Third, according to the record, appellant was not without the testimony of Tarlton. As with Blocker's testimony, appellant offered, and the court received into evidence, a transcription of the witness's comments uttered at the first trial. Again, while proffering the witness's testimony in this way may not have been as desirable as having him testify in person, appellant nonetheless had the benefit of the testimony.

In sum, we are unable to find that any prejudice potentially suffered by appellant was more than minimal. And, upon weighing this factor with the other *Barker* indicia, we also conclude that the balance tips against appellant. While the delay was indeed long, the reasons for it were not invidious. Appellant did little to protect his right, and the prejudice he suffered was insubstantial. Thus, the state did not violate his right to a speedy trial under *either* the United States or Texas Constitutions.

## Issue Three—Factual Insufficiency

 Via his third point, appellant contends that the evidence was factually insuf-

ficient to support his conviction. This is allegedly so because at the time the offense occurred, appellant tested negative for the venereal disease, chlamydia, found in T. We disagree.

### Standard of Review

The standard of review applicable to claims of factual insufficiency is adequately explained in *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App.1996) and its reported progeny. We need not repeat it.

### Application of Standard

It is undisputed that the record contains some evidence which permitted a rational jury to conclude, beyond reasonable doubt, that appellant sexually assaulted the ten-year-old girl. However, this finding is supposedly wrong and unjust due to the evidence that medical testing failed to reveal that either appellant or his wife were infected with chlamydia. Therefore, according to appellant, science established that he could not have been the assailant. The argument would be appealing if that was all the evidence of record, but more appeared. For instance, testimony indicated that 1) the disease was quite difficult to detect in males, 2) one's own body could, at times, effectively eradicate the bacteria without medical intervention, and 3) appellant's wife was taking (when tested) an antibiotic which could cure the infection. In other words, evidence existed suggesting that appellant and his wife may have had the disease around the time of the assault but that it was undetected by, or cured before, undergoing the testing. Given this evidence, a question of fact arose regarding appellant's identity as the assailant, which question the jury was obligated to resolve. And, in view of the record before us, we cannot hold that the verdict it subsequently rendered was manifestly unjust or clearly wrong.

Accordingly, we affirm the judgment.