## A06A0404. INGRAM v. THE STATE.
### (634 SE2d 430)

PHIPPS, Judge.

Leroy Ingram was tried by a jury and convicted of rape and false imprisonment. He claims that the trial court erred by denying his motion to dismiss based on the state's failure to provide him a speedy trial and by admitting similar transaction evidence. He also claims that his trial counsel was ineffective for failing to locate and subpoena material witnesses for the defense. We conclude that the trial court did not err by denying Ingram's motion to dismiss and did not abuse its discretion by admitting evidence of a similar transaction. We further conclude that Ingram has failed to establish that his trial counsel was ineffective. Thus, we affirm.

Viewed in the light most favorable to the verdict, the evidence showed that on the afternoon or early evening of August 24, 1998, Asha Melrose walked to her aunt's house, which was approximately one block away. As she and her aunt, Lisa Melrose, were sitting outside and listening to music, Ingram and his friend Michael McDonald parked across the street, where McDonald's cousins, Ronnie and Roy Searles, lived. Lisa Melrose knew Ingram and he called to her from across the street. Asha and Lisa Melrose went over and began talking to Ingram and McDonald. They offered the women beer and the women accepted. After drinking beer for several hours, Ingram and Asha and Lisa Melrose took McDonald home. Ingram then drove Asha and Lisa Melrose to a convenience store where they purchased more beer. They all returned to Lisa Melrose's place and sat outside a little longer before Asha Melrose told her aunt she wanted to go home and would walk. Ingram offered her a ride, but she initially refused. When her aunt told her that it would be okay, she agreed and got into Ingram's car.

As they drove away, Ingram claimed that he had to use the bathroom and pulled into the back of a shopping plaza. When he got out of the car, Asha Melrose grabbed her keys and purse and told him that she was going to walk home. Ingram grabbed her arm, threw her

to the ground and told her she was not going anywhere. He then lay on top of her and began pulling at her skirt and underclothes. She attempted to fight him off and told him to stop, but he would not. Ingram forced her to have sexual intercourse once while on the ground and again in the car. Asha Melrose thought that Ingram was going to kill her because, while they were drinking, he had repeatedly mentioned the fact that he kept a gun in the trunk of his car.

Asha Melrose then convinced Ingram that she needed to go home, and he gave her a ride toward her house. He asked her for her panties "so he didn't leave DNA." She initially refused. When it appeared that he was not going to let her leave, she threw him her panties and ran from the car. She ran to her grandmother's apartment, which was next door to her own, and told her grandmother that she had been raped. The police were called, and the responding officer testified that Asha Melrose had visible abrasions on her arms, legs and buttocks immediately after the incident.

Ingram testified that he had known Asha Melrose four or five months prior to August 24. He said that after he, Asha and Lisa Melrose took McDonald home and bought beer, they smoked crack cocaine and marijuana. Ingram said that Asha Melrose asked him to take her aunt home. He and Asha Melrose then drove to the back of a shopping plaza to finish smoking the cocaine. While there, they had a discussion about a light bill that her grandmother owed and he suggested she exchange sex for the money to pay the light bill. Ingram admitted that he and Asha Melrose had sexual intercourse in his car, but denied that he forced her. He testified that he later reneged on his agreement to pay her for the sex.

1. Ingram claims that the trial court should have granted his motion to dismiss based on the state's failure to provide him a speedy trial. We review the trial court's denial of Ingram's motion to dismiss under an abuse of discretion standard.[1]

Ingram was arrested in early September 1998 and indicted on April 27, 1999. He was released on bond six months after his arrest. On June 29, 1999, Ingram filed a demand for jury trial, but not a speedy trial. On April 29, 2002, Ingram filed a motion to dismiss claiming he had been deprived of his right to a speedy trial. He made a demand for a speedy trial on June 18, 2002, during a hearing on his motion to dismiss. Ingram's trial began on September 10, 2002, four years after he was arrested.

"A speedy trial is guaranteed an accused by the Sixth Amendment . . . to the Constitution of the United States, and also Article I of the Constitution of this State (now Art. I, Sec. I, Par. XI (a) of the

---

[1] *Brown v. State*, 264 Ga. 803, 805 (2) (450 SE2d 821) (1994).

1983 Ga. Constitution). These rights attach at the time of arrest, or when formal charges are brought, whichever is earlier."[2]

In *Barker v. Wingo*,[3] the United States Supreme Court set out a balancing test, in which the conduct of both the prosecution and the defense are weighed, to determine whether a defendant's constitutional right to speedy trial has been violated. Some of the factors to be considered include: the length of delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant.[4] None of the factors is either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial; rather, they are related factors that must be considered together.[5]

(a) *Length of the delay.* The delay of 48 months between arrest and trial is presumptively prejudicial.[6] Thus, we consider the remaining factors to determine if Ingram's constitutional right to speedy trial was denied.[7]

(b) *Reason for the delay.* "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government."[8] Here, there is no evidence that the state intentionally delayed the trial to impair Ingram's defense.

The record in this case makes it difficult to ascertain the reason for the delay. Some of the delay may be attributable to the case being handled by several different prosecutors. The case was also transferred to a different judge sometime after July 2000. The state notes that the Fulton County jail has suffered from substantial overcrowding in the past several years, which has resulted in "jail cases" being given priority over "bond cases." The case appeared on the trial calendar several times in 2000 and 2001, but the record does not indicate the reasons the case was continued.[9] "Where no reason appears for a delay, we must treat the delay as caused by the negligence of the State in bringing the case to trial."[10]

---

[2] *Boseman v. State*, 263 Ga. 730, 731 (1) (438 SE2d 626) (1994) (citations and punctuation omitted).

[3] 407 U. S. 514 (92 SC 2182, 33 LE2d 101) (1972).

[4] Id. at 530.

[5] Id. at 533.

[6] See *Boseman*, supra at 732 (1) (a) (27-month delay is presumptively prejudicial); *Jernigan v. State*, 239 Ga. App. 65, 66 (517 SE2d 370) (1999) (17-month delay raises presumption of prejudice); see also *Perry v. Mitchell*, 253 Ga. 593, 594 (322 SE2d 273) (1984) (delay of two years is deplorable).

[7] See *Barker*, supra at 530.

[8] Id. at 531 (footnote omitted).

[9] Ingram's counsel argued that the prosecution announced "not ready" every time the case was called for trial.

[10] *Boseman*, supra at 733 (1) (b) (citation omitted); *Snow v. State*, 229 Ga. App. 532, 533 (494 SE2d 309) (1997).

Reasons such as negligence and overcrowded courts should be weighed against the state because the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.[11] However, these reasons are weighed less heavily against the state than a deliberate attempt to delay.[12]

Ingram was initially represented by appointed counsel, but later retained counsel of his own. Retained counsel withdrew approximately eight months later, and Ingram was again represented by his appointed counsel. These changes may have contributed to the delay.

We conclude that the majority of the delay is attributable to the state and must be weighed against it in our analysis.[13]

(c) *Defendant's assertion of his right.* Ingram did not assert his right to a speedy trial until June 18, 2002, approximately 45 months after he was arrested. This delay in asserting his right to a speedy trial must be weighed against Ingram.[14]

(d) *Prejudice to the defendant.* Prejudice should be assessed in the light of the interests of defendants that the speedy trial right was designed to protect.[15] The court in *Barker* identified three such interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."[16] The last of these factors is the most serious.[17]

Ingram was released on bond six months after his arrest; thus there was no lengthy pretrial incarceration. However, "even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility."[18] Here, Ingram has not shown actual anxiety or concern as a result of the delay that would balance this factor in his favor.[19]

With respect to the last factor, Ingram argues that three witnesses for the defense — McDonald and the Searles brothers — became unavailable during the four-year delay between his arrest and trial. To prove prejudice due to the unavailability of these

---

[11] *Barker*, supra.

[12] Id.

[13] See, e.g., *Boseman*, supra.

[14] *Barker*, supra at 531-532; *Boseman*, supra at 733 (1) (c).

[15] *Barker*, supra at 532.

[16] Id. (footnote omitted).

[17] Id.

[18] Id. at 533 (citations omitted).

[19] See *Johnson v. State*, 268 Ga. 416, 418 (2) (490 SE2d 91) (1997); see also *Boseman*, supra at 733 (1) (d) (anxiety and concern are always present to some extent; absent some unusual showing, this factor is not likely to be determinative in defendant's favor).

witnesses, Ingram must show that the unavailable witnesses could supply material evidence for the defense.[20]

Ingram claims that the witnesses could have testified to alcohol use on the night of August 24 "and provided other exculpatory testimony." He claims that McDonald could have testified that Asha and Lisa Melrose had a reputation for using drugs. At the motion for new trial hearing, Ingram testified that all three men knew that he and Asha Melrose were flirting with each other the night of August 24 and that he and Asha Melrose had known each other for several months prior to that night and had a relationship that involved "a little fondling here and there more or less." Ingram also testified that the men knew about the drug activity that night. Ingram testified that he attempted to locate these men after he was released on bond, but that they had moved and he was unable to obtain any current information on their whereabouts. With respect to the alcohol use on August 24, Asha and Lisa Melrose testified that they all drank beer for several hours, and Lisa Melrose admitted that she and her niece were both intoxicated. Ingram testified at trial that only he, Asha and Lisa Melrose were present during the alleged drug use.

At trial, Ingram testified that he knew Asha Melrose prior to August 24, but never testified that she flirted with him prior to having sexual intercourse that night or that they had a prior relationship that involved any physical touching. Ingram could not remember any specific dates before August 24 when he had gotten together with Asha Melrose. In addition, a surveillance tape from the convenience store where they purchased beer on August 24 showed Ingram grabbing Asha Melrose and her pushing him away. Furthermore, it is undisputed that Ingram and Asha Melrose were alone when the incident occurred. The crucial issue here is whether the sexual intercourse between Ingram and Asha Melrose on August 24 was forced or consensual. Ingram has not shown that these witnesses could have offered testimony on that issue. Under these circumstances (and assuming that McDonald and the Searles brothers could have been located), the testimony Ingram claims McDonald and the Searleses would have provided on these issues would have been either cumulative or not material.

At the motion for new trial hearing, Ingram did submit an affidavit purportedly signed by McDonald that was given to an investigator hired by Ingram's appellate counsel. The investigator had been unable to locate McDonald since obtaining the affidavit. Assuming, without deciding, that McDonald's affidavit was properly admitted, it was not sufficient to show that McDonald's testimony

---

[20] *Jernigan,* supra at 67.

would have been material to Ingram's defense. The affidavit referred to several females only as, "the girls I met befor[e]," "[t]he heavy set red chick" and "her nie[c]e the slim one that likes Leroy." It made reference to a weekend "sometime around" September 24, 1998, which would have been after Ingram was arrested, when "the slim one" and Leroy went into an apartment across from his cousin's house and were gone for a couple of hours.

Balancing all four factors set out in *Barker*, we conclude that the delay in this case did not violate Ingram's constitutional right to a speedy trial.[21] Accordingly, the trial court did not err by denying Ingram's motion to dismiss.[22]

2. Ingram claims that the trial court erred by admitting evidence of a similar transaction. He argues that there was insufficient similarity or connection between the prior offense and the charged offense.

The state introduced a certified copy of Ingram's prior conviction for aggravated assault upon a woman "with [the] intent to have carnal knowledge of and connection with said female, forcibly and against her will." Captain Patricia Boyce of the East Point police department testified that on February 15, 1990, at approximately 2:00 a.m., she was patrolling the back of a shopping center and saw a car in the alley. When she directed her lights into the alley, she saw Ingram "down across a lady beating her about the head." Boyce could hear the woman's head "thumping against the concrete." Ingram continued beating the woman until Boyce identified herself as a police officer and ordered him to stop. Ingram then attempted unsuccessfully to flee. While Boyce was taking him into custody, the woman ran from the alley screaming that Ingram was trying to kill and rape her. She was unclothed from the waist down and was bleeding from her mouth and head. Boyce saw torn pantyhose in Ingram's car and torn underwear and high-heeled shoes in the area where Ingram was beating the woman.

Boyce and the victim went to the hospital emergency room, where Boyce interviewed the victim. She explained that she was walking home from the train station and Ingram offered her a ride. She got into the car with him and directed him where to go. When he turned away from her residence, she told him that he had taken a wrong turn. Ingram responded, "I'm going to get some booty tonight or I'm going to beat your ass." The victim chose the second option.

---

[21] See *Jernigan*, supra at 68; see also *Thomas v. State*, 233 Ga. App. 224, 226 (2) (504 SE2d 59) (1998).

[22] See *Jernigan*, supra.

After Ingram drove her behind the shopping plaza, they began struggling and fighting. That continued until Boyce arrived.

Before any evidence of independent offenses may be admitted, the trial court must conduct the hearing required by Uniform Superior Court Rule 31.3 (B) and the state must show: (1) that it seeks to introduce the evidence not to raise an improper inference as to the defendant's character but for some proper purpose; (2) that there is sufficient evidence to establish that the defendant committed the independent offense; and (3) that there is a sufficient connection or similarity between the independent offense and the crime charged so that proof of the former tends to prove the latter.[23] A crime does not have to be identical to the crime charged to be admissible as a similar transaction.[24]

"The rules regarding the use of similar transaction evidence are construed most liberally in cases involving sexual offenses."[25]

> In addition, when forcible sexual assaults are involved, there is at least much sociological evidence to support the conclusion that this type of deviant sexual behavior is a sufficiently isolated abnormality so that proof of the propensity of the defendant to engage in it is at least admissible, and to this extent proof of the one tends to establish the other.[26]

In a rape prosecution, the prior assault need not have resulted in an actual sexual assault or completed rape to be admissible.[27] The trial court conducted the required hearing prior to admitting the similar transaction evidence. The state argued that evidence of the prior offense would show intent, course of conduct and lustful disposition. The trial court ruled that the state had satisfied the three requirements necessary for admission of similar transaction evidence. A trial court's determination that similar transaction evidence is admissible will not be disturbed absent an abuse of discretion.[28]

Here, the purposes for which the state sought to introduce the similar transaction were proper.[29] The testimony of the arresting

---

[23] *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991).

[24] *Jones v. State*, 226 Ga. App. 721, 723 (1) (487 SE2d 618) (1997).

[25] *Mangham v. State*, 234 Ga. App. 567, 569 (1) (507 SE2d 806) (1998) (citation and punctuation omitted).

[26] *Robbins v. State*, 277 Ga. App. 843, 844 (1) (627 SE2d 810) (2006) (citation and punctuation omitted).

[27] Id. at 845.

[28] *Mangham*, supra.

[29] See *Glass v. State*, 255 Ga. App. 390, 393-394 (2) (565 SE2d 500) (2002) (intent and course of conduct); *Robbins*, supra at 844 (lustful disposition).

officer, who witnessed the assault, was sufficient to establish that Ingram committed the prior offense. The evidence showed that both offenses involved attacks by force against women for the purpose of forcing sexual intercourse upon them and that both occurred behind a shopping center where Ingram drove his car after promising to take the women home. Both offenses also involved Ingram forcing the victim to the ground and resulted in visible injuries to the victim. Ingram argues that the cases are not sufficiently similar because there is no evidence of alcohol or drug use associated with the prior offense and no evidence that he knew the victim of the prior offense. However, the proper focus is on the similarity, not the differences, between the two offenses.[30] We conclude that the trial court did not abuse its discretion in admitting evidence of the similar transaction.[31]

3. Ingram claims that his trial counsel was ineffective because he failed to sufficiently investigate the location of and subpoena material defense witnesses, i.e., McDonald.

To establish ineffectiveness of trial counsel, Ingram must show that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[32] The standard for attorney performance is reasonably effective assistance considering all the circumstances, with a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy.[33] The test for reasonable attorney performance is " 'whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. . . .' "[34]

Ingram argues that if McDonald had testified, he would have impeached the testimony of Asha and Lisa Melrose by testifying that Asha Melrose knew Ingram before August 24 and that Asha and Lisa Melrose had a reputation for using drugs. Ingram testified at the motion for new trial hearing that he had tried to find McDonald while he was out on bond but was unable to do so. His trial counsel testified that he had attempted unsuccessfully to locate the individuals Ingram had informed him would have information about the case.

"Trial counsel cannot be held ineffective for failing to track down a witness whose whereabouts are unknown."[35] And even if trial counsel should have taken additional steps to locate and subpoena this witness, Ingram has failed to show how this failure prejudiced

---

[30] *Nashid v. State*, 271 Ga. App. 202, 205 (1) (609 SE2d 106) (2004).

[31] See *Robbins*, supra at 845.

[32] *Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984).

[33] Id. at 687-689.

[34] *Stansell v. State*, 270 Ga. 147, 150 (2) (510 SE2d 292) (1998) (citations omitted).

[35] *Morris v. State*, 257 Ga. App. 169, 172 (2) (570 SE2d 619) (2002) (citation omitted).

his defense.[36] We have previously held that "where the missing witness does not testify at the motion for new trial hearing, no evidence supports the claim that the witness was crucial to the defense or that the witness could have been located."[37]

The affidavit Ingram submitted at the motion for new trial hearing, which was purportedly signed by McDonald, provided some information about what McDonald might have said at trial, but it was not sufficient to show that McDonald's testimony would have been helpful to Ingram's defense.[38] As set forth in Division 1 (d), the affidavit did not adequately identify the women referred to therein and referred to an incident that allegedly occurred after Ingram had been arrested. This vague testimony is not sufficient to support Ingram's claim of ineffective assistance of counsel.

*Judgment affirmed. Ruffin, C. J., and Smith, P. J., concur.*

DECIDED JUNE 26, 2006 —
RECONSIDERATION DENIED JULY 13, 2006 — 

*Thomas S. Robinson III*, for appellant.
*Paul L. Howard, Jr., District Attorney, Anne E. Green, Assistant District Attorney*, for appellee.

---

[36] See *Baker v. State*, 251 Ga. App. 377, 380 (2) (554 SE2d 324) (2001).

[37] Id. (citation omitted).

[38] See *Letson v. State*, 236 Ga. App. 340, 341 (2) (512 SE2d 55) (1999) (trial counsel's failure to call a witness cannot be deemed "prejudicial" without a showing that the witness's testimony would have been relevant and favorable to the defendant).