# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 10, 2009

## STATE OF TENNESSEE v. CARLOUS LEON CLARK

**Direct Appeal from the Circuit Court for Madison County**
**No. 06-486      Roy B. Morgan, Jr., Judge**

---

**No. W2009-00025-CCA-R3-CD  - Filed March 18, 2010**

---

A Madison County grand jury indicted the Defendant, Carlous Leon Clark, for attempted first degree murder, two counts of aggravated assault, aggravated burglary, and assault. The Defendant moved to dismiss the charges, claiming that a trial would not comply with the speedy trial provisions of the United States and Tennessee constitutions. The trial court denied the Defendant's motion to dismiss, and a Madison County jury convicted the Defendant of attempted first degree murder, assault, two counts of aggravated assault, and aggravated criminal trespass. On appeal, the Defendant contends that the trial court erred when it denied his motion to dismiss based on a violation of his right to a speedy trial. After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Susan D. Korsnes, Jackson, Tennessee, for the appellant, Carlous Leon Clark.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; David H. Findley, Assistant Attorney General; James G. Woodall, District Attorney General; Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Background

### A. Factual Background

A Madison County grand jury, in October 2006, indicted the Defendant on one count of

attempted first degree murder, two counts of aggravated assault, one count of assault, and one count of aggravated burglary. Following the October 2008 trial on these charges, the jury convicted the Defendant of attempted first degree murder, assault, aggravated assault, and aggravated criminal trespass.

At trial, the following evidence was presented: Sholanda Buchanan testified that in April 2006 she dated the Defendant. She described the relationship as "a little shaky" and "an off and on thing." Buchanan testified that, in April 2006, she was living at 322 Hatton Street ("Hatton Street") in Jackson, Tennessee, with her four children. On April 7, 2006, Buchanan and the Defendant argued, and she broke off their romantic relationship. Buchanan recalled that later that evening she was at her house preparing to go out with her friend, William Peters. Peters arrived at Buchanan's house, and she and Peters were standing outside talking when the Defendant drove up in a gray rental car. The Defendant became angry and said, "What you and this bitch got going on? You f'ing this bitch[?] This my woman." Peters then left.

Buchanan testified the Defendant then ran toward her, she fled into her house, and the Defendant followed. Eric Chandler, Buchanan's brother, called Buchanan's phone, but the Defendant snatched the phone from her and put it in his pocket. Buchanan attempted to retrieve the phone, which lead to a physical altercation between the two. Buchanan testified that, frightened and trying to get the Defendant out of her house, she picked up a Crown Royal bottle and hit the Defendant in the head. The altercation then moved outside Buchanan's house. Buchanan recalled that Chandler appeared during the altercation, grabbed the Defendant's shirt collar, and swung him from one side of the Defendant's car to the other and told the Defendant to leave. The Defendant replied "I'm gonna kill that bitch." Buchanan described the Defendant's state as "a bad rage." The Defendant left in his car.

Buchanan testified she did not call the police because she did not want to see the Defendant go back to jail and that Chandler remained at the house with her. Buchanan recalled that she heard a car honk outside her home and that she advised her brother not to go outside. Chandler went outside anyway, and the Defendant was standing outside of his car with a gun aimed at Buchanan and Chandler. The Defendant proceeded to fire the weapon and shot Chandler, who fell to the ground. The Defendant repeatedly said, "I'm gonna kill you, bitch." Buchanan testified she feared for her life and ran back into the house to her bedroom with Chandler following. She recalled hearing two more gunshots outside her house. Chandler fell against her bedroom door and asked Buchanan to open the door but she was too afraid to open the door. After she heard the Defendant and Chandler leave the house, Buchanan came out of her bedroom. Chandler was gone, and Buchanan watched the Defendant leave in his car. Buchanan testified that she had not seen the Defendant since that night but that the Defendant had called her repeatedly attempting to see her.

On cross-examination, Buchanan admitted that she had also placed calls to the Defendant, but she insisted she did so only to ensure the Defendant did not leave Jackson. Buchanan further acknowledged Chandler was on probation at the time of the shooting and could have gone to prison if in possession of a gun, but she reiterated that the Defendant, not Chandler, had the gun. Buchanan

agreed that she had no cuts, bruises, or abrasions as a result of the April 7 altercation with the Defendant. Buchanan confirmed that, when the Defendant returned to her home, Chandler walked out the front door, and she followed, standing in the doorway. Buchanan testified that she did not remember stating at the preliminary hearing on these charges that she walked out the front door first, and Chandler followed. Buchanan also explained her statement at the preliminary hearing that she told her brother the Defendant was in the house and was "jumping" on her: She said that, although the Defendant snatched her phone from her, Chandler was able to overhear their conversation because the cell phone was still on. Buchanan testified that "her head [was] really not together because she had been through a lot, but she insisted her testimony at trial was true.

On redirect examination, Buchanan was asked to read a portion of the preliminary hearing transcript where she testified that, upon the Defendant's return to her home, Chandler walked out the front door first, and she followed him.

William Peters, Buchanan's friend, testified that he was at Buchanan's house on April 7, 2006, to take her out to a club. When Peters arrived at Buchanan's house, he saw the Defendant knocking on the front door. Peters called Buchanan and told her someone was knocking on her door, and she told Peters to leave and come back later. Peters drove around the block until Buchanan confirmed that the Defendant was gone, and Peters returned to her house. Peters exited his vehicle when he saw the Defendant walking toward the house. Peters described the Defendant's demeanor as irate and angry, and he recalled that, because the Defendant approached him in a hostile manner, he decided to leave. Peters recalled Buchanan telling the Defendant to leave, but the Defendant forced his way into her house. Peters again drove around the block and attempted to call Buchanan. He heard her say, "call 911," and then the phone was cut off. Peters decided to return to Buchanan's home, and police were there when he arrived.

On cross-examination, Peters could not explain why the police report prepared in this case did not mention his phone call to Buchanan that night. Also, Peters explained he did not call 911 as Buchanan requested because he did not want to call unnecessarily; rather he returned to Buchanan's home and saw that the police were already there.

Demetrius Golden testified that in April 2006 he was a crime scene technician with the Jackson Police Department. Golden stated that he reported to Hatton Street and photographed the outside of the house, blood spatter in the house and at the curb, a spent bullet, damage to the front door, and a marking made by the bullet in the house. Golden also collected a bullet casing from the front of the house, near the curb.

The State entered into evidence Chandler's death certificate, which indicated he died on April 7, 2007, of causes unrelated to these charges. Sergeant Tyreece Miller, employed in the violent crimes unit, read into evidence Chandler's testimony at the preliminary hearing on this matter. Chandler testified that on April 7, 2006, on his way to Buchanan's house, Buchanan called him. She told him the Defendant was at her house and attacking her. Chandler testified that, because the phone did not get hung up, he continued to hear the altercation between the Defendant and

Buchanan. When Chandler arrived at Buchanan's house, he saw the Defendant with his hands at Buchanan's neck. Chandler testified that he grabbed the Defendant's shirt collar and put him at the back end of the Defendant's car. When he let the Defendant go, Buchanan hit the Defendant on the head with a bottle. The Defendant got in his car and left but returned shortly thereafter. Chandler came out of Buchanan's house, and the Defendant began shooting, hitting Chandler in the shoulder and then the arm, fracturing his arm. Chandler ran back into the house, and the Defendant continued to shoot the gun. Chandler leaned up against Buchanan's bedroom door and watched the Defendant enter the house looking for Buchanan. When the Defendant entered one of the children's bedrooms, Chandler ran out the door and around the back of the house into the alley. Chandler called his wife to take him to the hospital and left with her to seek treatment for his gunshot wounds. Chandler denied having a weapon on him when he approached the Defendant outside Buchanan's home.

Dr. Jim Craig testified that, on April 7, 2006, he worked as an emergency room physician at Jackson-Madison County General Hospital where he initially treated Chandler. Dr. Craig recalled that Chandler had two gunshot wounds, one to the left arm that fractured Chandler's upper arm and the other to the left shoulder.

Officer Allen Randolph, with the Jackson Police Department, testified that on April 9, 2006, he reported to a hotel to help locate the Defendant. After police took the Defendant into custody, Officer Randolph searched a silver Toyota Avalon the Defendant had rented. Officer Randolph testified that, from inside the vehicle's glove box, he recovered a five-shot .38 caliber revolver with all five chambers loaded with ammunition. The gun was dusted for prints, but police were unable to develop any latent prints.

Shelly Betts worked for the Tennessee Bureau of Investigation in the firearms identification unit and testified as an expert in the field of ballistics and firearms identification. Betts examined the .38 caliber revolver recovered from the Defendant's vehicle and determined that the five rounds recovered in the .38 caliber revolver were the same type and design as the discharged bullet recovered at Hatton Street. Betts also determined that the discharged bullet had the same class characteristics as, and similar individual characteristics to, the bullets test fired at the lab. Due to damage to the discharged bullet, Betts could say only that it was likely the bullet was discharged from the .38 caliber revolver.

Tracy Davidson testified that she was with the Defendant at the hotel when he was arrested on April 9, 2006, for these crimes. Davidson testified that the Defendant showed up at her hotel room bleeding. The Defendant told her that Buchanan and Chandler attacked him and that Buchanan hit him with a Crown Royal bottle. The Defendant further stated that he "just snapped" and shot Chandler but hoped he had not killed Chandler. Davidson said that the Defendant told her that he would have shot Buchanan but could not find her. Davidson acknowledged that she had a substance abuse problem. On cross-examination, Davidson admitted that, when the Defendant was arrested, she was charged with possession of a crack pipe.

The Defendant testified that he dated Buchanan for approximately a year-and-a-half. The

Defendant recalled that Buchanan called him on April 7, 2006, and asked him to come to her house. The Defendant agreed, although he planned to go to Nashville for the weekend with another female who was with him at his house. The Defendant said his plans changed, however, and he went to Buchanan's house around 10:00 p.m. The Defendant and Buchanan began arguing over the female the Defendant had been with, and he decided to leave. He testified he went to a convenience store and then returned to Buchanan's house. He said that, when he arrived, Buchanan again began to argue with him, and Peters pulled up in his car in front of Buchanan's house. Peters called Buchanan, and the Defendant snatched the phone from her and put it in his pocket. He walked outside and asked Peters what was going on between Peters and Buchanan. Peters responded that the Defendant should ask Buchanan, and the Defendant turned to leave. As he was leaving, Buchanan asked for her phone back, but he refused because he had purchased the phone. The Defendant recalled that ,when he reached the back end of his car, Chandler grabbed him and pinned him against the car. Buchanan hit the Defendant with a Crown Royal bottle and blood began to run into his eyes, which obscured his vision. He told Chandler he could not see, but Chandler slung the Defendant to the front of the car, causing the Defendant to fall to the ground. According to the Defendant, as Chandler reached down for the Defendant, a gun fell to the ground. The Defendant said he picked up the gun and shot at Chandler, but the Defendant did not know whether he hit Chandler or not. After firing the gun, the Defendant got in his car and left. The Defendant denied entering Buchanan's house without permission.

On cross-examination, the Defendant explained the discrepancies in the testimonies of the other witnesses by stating that Buchanan, Chandler, Peters, and the police had all lied. He admitted that he did not go to the hospital for his injuries because he knew police would be looking for him. He also agreed that he never called police to report that he was attacked and that he never told anyone the version of the shooting to which he testified at trial. The Defendant stated that he fired three shots and took the gun with him when he left Hatton Street. The Defendant could not explain how the gun was reloaded after firing it three times. The Defendant admitted that he had previous convictions for aggravated kidnapping, assault with intent to commit robbery, and armed robbery.

A jury found the Defendant guilty beyond a reasonable doubt of attempted first degree murder, assault, aggravated assault, and aggravated criminal trespass.

**B. Procedural Background**

In January 2007, the Defendant filed a motion for a speedy trial, which was granted, and the trial court set a trial date of April 3, 2007. On March 19, 2007, the trial court became aware the Defendant was in federal custody on related charges and would not be relinquished from federal custody until the conclusion of the Defendant's federal case. All parties agreed to remove the case from the trial docket and to set a March 28, 2007, status check. Another agreed order continuing the case was entered on March 30, 2007, due to the Defendant's being in federal custody. Status checks were held monthly and ultimately the Defendant's federal trial was set for December 2007, and his sentencing was set for March 25, 2008. A transport order for April 7, 2008, was issued based upon the federal sentencing date. The order, however, was not honored, and the Defendant was not

present. A transport order was not issued for the April 29, 2008, status check, but the Defendant was present in court on July 7, 2008. The case was continued for a week to allow the Defendant to consult with his attorney. The Defendant then filed a motion to dismiss for lack of a speedy trial. After a hearing, the trial court denied the motion, finding both parties agreed to continue the trial from the original date, the State was diligent in its attempts to have the Defendant returned from federal custody, and the Defendant was not prejudiced by the delay.

## II. Analysis

The Defendant contends that the trial court erred by denying his motion to dismiss for denial of his right to a speedy trial. We conclude that the trial court properly denied the Defendant's motion because the reasons for the delay were neutral, the Defendant agreed to the continuances, and the Defendant did not suffer actual prejudice from the delays.

The Sixth Amendment to the United States Constitution and the Tennessee Constitution provides a defendant with the right to a speedy trial. U.S. Const. Amend. VI; Tenn. Const. Art. I, § 9. The purpose of the right to a speedy trial is to protect defendants from harm, such as, "oppressive pre-trial incarceration, anxiety and concern of the accused, and the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." *Doggett v. United States*, 505 U.S. 647, 654 (1992).

In *Barker v. Wingo,* 407 U.S. 514 (1972), the United States Supreme Court developed a four-prong balancing test to determine whether a defendant has been deprived of the right to a speedy trial. The four factors considered are the length of the delay, the reasons for the delay, the defendant's assertion of the right, and the prejudice suffered by the defendant. *Id.* at 530. The "triggering mechanism" for the presumption of a speedy trial violation is one year; however, the specific circumstances of each case must also be considered. *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997). In this case, the Defendant was indicted in October 2006, and the Defendant's trial was in October 2008. This delay warrants a further examination of the specific circumstances of this particular case in light of the remaining three *Barker* factors. We would note, however, that this factor should not weigh heavily against the State, as a two-year delay from indictment to trial is not excessive in light of other cases. *See State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001); *compare Doggett,* 505 U.S. at 647 (six-year delay); *State v. Wood*, 924 S.W.2d 342 (Tenn. 1996) (thirteen-year delay); *State v. Hutchings*, No. M2008-00814-CCA-R3-CD, 2009 WL 1676057, at *5 (Tenn. Crim. App., Nashville, Feb. 10, 2009) (eight-year delay).

The next factor to be considered is the reason or reasons for the delay which should be "neutral." *Barker*, 407 U.S. at 531. In *State v. Wood*, our Supreme Court identified four possible reasons for delay, they include:

(1) Intentional delay for tactical advantage or to harass the defendant;
(2) bureaucratic indifference or negligence;
(3) necessary delay for the fair and effective prosecution of the case; and

(4) delay agreed to or caused by the defendant.

*State v. Wood*, 924 S.W.2d 342 (Tenn. 1996). In this case, the Defendant does not contend that the delay was due to the State's intentional act to gain advantage or harass him. We, likewise, do not find that the record indicates such action by the State. The Defendant asserts instead that bureaucratic indifference has deprived him of his right to a speedy trial. Our review of the record reveals that the State requested and obtained transport orders, but the orders were not recognized. Both parties agreed to move the trial date due to the Defendant's federal custody, and, thereafter, monthly hearings were held to track the status of the Defendant's federal cases. A transport order was issued four days after the conclusion of the Defendant's cases, but the order was not honored. In April 2008, the trial court failed to issue a transport order, but the Defendant appeared in court in July 2008, and the trial was set and held in October 2008. The record does not demonstrate that the State was indifferent to the Defendant's right to a speedy trial. In fact, the record reveals that the State diligently requested transport orders and followed the Defendant's federal status. The State did so in anticipation of promptly disposing of its charges against the Defendant upon his release from federal custody. We do not find that these circumstances rise to the level of bureaucratic indifference or negligence by the State.

The State does not contend that the delay was necessary for the fair and effective prosecution of the Defendant's charges. As for the Defendant's role in the continuances, the Defendant, through defense counsel, twice agreed to continue his trial after the original trial date was set at the hearing on the motion for speedy trial. Because the Defendant agreed to the continuances, the reason for the delay is neutral.

A defendant's assertion of the right, while not required, is "entitled to strong evidentiary weight." A defendant's agreement to continuances after a speedy trial request, however, will diminish the weight given this factor. *Barker*, 407 U.S. at 521; *State v. Hugh Peter Bondurant, Jr.*, No. M1998-00494CCA-R10CD, 1999 WL 1209514, at \*6 (Tenn. Crim. App., Nashville, Dec. 17, 1999). The Defendant asserted his right to a speedy trial in February 2007, and the trial court granted the motion, setting the trial date within sixty days. However, because the Defendant agreed to continue the case after he asserted his speedy trial right, his agreement negated his assertion of his right to a speedy trial. *See State v. Lewis*, No. M2005-02279-CCA-R3-CD, 2006 WL 2738160, at \*3 (Tenn. Crim. App., Nashville, Sept 26, 2006) *Tenn. R. App. P. 11 application denied* (Tenn. Jan. 29, 2007).

Finally, we consider the prejudice to the Defendant caused by the delay in light of the interests protected by the speedy trial right. *Barker*, 407 U.S. at 532. The Defendant asserts that the delay impaired his defense because the victim in the attempted first degree murder charge, Eric Chandler, before trial. Chandler died April 7, 2007, of causes unrelated to these charges. Chandler did, however, testify at the May 4, 2006, preliminary hearing in this case and was cross-examined by the defense.

Although Chandler is clearly significant to the case, the Defendant has not shown any actual

prejudice from the lack of Chandler's testimony at trial. Chandler's preliminary hearing testimony was presented at trial. Further, Chandler's testimony likely would have harmed the Defendant's case as Chandler could clearly identify the Defendant as the perpetrator of the crimes. Chandler's testimony was consistent with Buchanan and Peter's testimony as well as the testimony about the gun recovered in the Defendant's vehicle. The Defendant argues that the jury was unable to determine Chandler's credibility as a witness since he was not in court. Even assuming that the jury found Chandler's testimony not truthful, they apparently did credit Buchanan, Peters, and the testimony of various law enforcement officers at the trial, which was consistent with Chandler's preliminary hearing testimony.

While the delay was sufficient to trigger a *Barker* inquiry, the Defendant has failed to establish a meritorious claim for a speedy trial violation. Accordingly, we conclude that the trial court did not abuse its discretion when it denied the Defendant's motion to dismiss for lack of a speedy trial.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude that the trial court did not err when it denied the Defendant's motion to dismiss for lack of a speedy trial. As such, we affirm the trial court's judgment.

 

_____
ROBERT W. WEDEMEYER, JUDGE